In re SAV–A–STOP
INCORPORATED, Debtor.

SAV–A–STOP
INCORPORATED, Plaintiff,

v.

JAYDON, INC., Defendant.

Bankruptcy No. 87–830–BKC–3P1.
Adv. No. 90–39.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Feb. 4, 1991.

Karen S. Jennemann, Jacksonville, Fla., for plaintiff.

David Herbst, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This proceeding is before the Court on motions of plaintiff and defendant for summary final judgments, heard on October 18, 1990. Upon the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. This proceeding is brought pursuant to § 542(b) of the Bankruptcy Code to require the turnover of property of the estate.

2. On May 29, 1987, plaintiff, Sav–A–Stop Incorporated ("SAS") filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

3. In July, 1987, SAS sued defendant, Jaydon, Inc. ("Jaydon"), a former competitor, and seven of SAS's ex-employees in the United States District Court for the Western District of Missouri, Southern Division, Case No. 87–3373–CV–S–4 (the "Lawsuit"). SAS alleged that Jaydon and the ex-employees conspired, while the ex-employees were still working for SAS, to unfairly take a large number of SAS's customers. On October 13, 1988, a summary judgment was entered against Jaydon and six of the ex-employees awarding SAS $8,000 in damages (the "Summary Judgment Order").

4. Soon after the decision, Jaydon, through David Baugh, its attorney, offered to settle the Lawsuit for $25,000. At about this same time, SAS made the business decision to discontinue its service to all customers outside of a 500–mile radius of Jacksonville. Thus, Jaydon was a potential buyer of many of those customers. In order to receive value for transferring those customers to Jaydon, and to avoid the additional expense of an appeal by SAS of the Summary Judgment Order to increase the damages awarded, SAS initiated settlement discussions with Jaydon.

5. On October 24, 1988, William Nussa, then president and chief executive officer of SAS, met with Jay Gellerman, chief executive officer of Jaydon, to discuss settlement of the Lawsuit and the sale of SAS's customers in Jaydon's operating region. At that meeting, Gellerman and Nussa agreed to settle the Lawsuit and to attempt to transfer the customers.

6. At the October 24, 1988, meeting, Nussa gave Gellerman a list of SAS's customers and employees in the areas which Jaydon serviced. Nussa also gave Gellerman substantial additional information regarding several of those customers. Nussa delivered to Gellerman documents and information in reliance upon their settlement of the Lawsuit and in order to meet SAS's duties under the settlement. Quick action was essential as SAS was immediately discontinuing service to the customers. Nussa also offered to give Gellerman additional help with the solicitation of customers, but he declined the offer.

7. On October 25, 1988, David E. Otero, the attorney representing SAS in the Lawsuit, received a telephone call from SAS advising him that Nussa and Gellerman had agreed to settle the Lawsuit and were to try to transfer various customers from SAS to Jaydon. Otero was asked to memorialize the terms in a letter that would be signed by Jaydon.

8. On October 27, 1988, Otero sent a letter to Baugh via facsimile. Baugh and Otero then spoke by telephone regarding the terms of the letter and Otero sent an amended letter via facsimile to Baugh on November 10, 1988, again describing the terms of the settlement. Otero also spoke with Baugh on the telephone and Otero sent a third letter describing the terms of the settlement. The third letter was dated November 18, 1988, and was signed by Baugh and returned to Otero (the "Agreement").

9. The terms of the Agreement were: (i) Jaydon agrees to pay SAS a minimum of $40,000 upon approval of the Agreement by the Court, (ii) SAS and the defendants in the Lawsuit agree to exchange mutual releases, (iii) SAS agrees to aid Jaydon in transferring those customers to Jaydon which SAS had chosen to discontinue service, and (iv) if one-half of one percent of the gross sales revenue which Jaydon collected from the transferred customers exceeded $40,000 for a one-year period ending January 17, 1990, the excess amount was to be paid by Jaydon to SAS.

10. After the October 24, 1988, meeting Nussa, at Gellerman's request, called several former SAS customers on Jaydon's behalf and he personally visited Roy Thornberg of Associated Grocers in Michigan on Jaydon's behalf. Jaydon made no other requests for aid in soliciting customers to Nussa or anyone else at SAS. Jaydon never contacted Nussa again regarding the solicitation of customers or any other matter pertaining to the Agreement.

11. SAS did not timely appeal the Summary Judgment Order in reliance upon the Agreement and has forfeited the right to appeal the Summary Judgment Order.

12. On November 30, 1988, Baugh sent Otero additional proposed settlement documents. Nussa called Gellerman in late December, 1988, or early January, 1989, to tell him that the drafts prepared by Jaydon's counsel were too complicated and that Otero would send Jaydon's counsel simpler documents.

13. Between January, 1989, and mid-April, 1989, Otero spoke with Baugh on the telephone several times concerning the specifics of the settlement documents. On April 13, 1989, Otero sent Baugh the revised settlement documents. After waiting two weeks, Otero sent him a reminder letter on May 2, 1989. On May 24, 1989, Baugh sent Otero another set of proposed settlement documents which substantially comported with Otero's drafts transmitted to Baugh on April 13, 1989. The only two points that were not acceptable to SAS in these documents were the blanket five-year non-compete agreement and the require-

ment that SAS supply two of its employees at its own expense to render miscellaneous services to Jaydon.

14. Otero was told by Nussa that neither of the two disputed terms was discussed at the time the Agreement was reached. On June 7, 1989, Otero sent Baugh a letter regarding those two terms, stating that Gellerman and Nussa had not discussed those terms at the time the Agreement was reached. Otero also spoke to Baugh on the telephone regarding those two terms. During that conversation, Baugh and Otero agreed on behalf of their clients to amend the May 24, 1989, documents to provide for a two-year non-compete agreement and use the language Otero suggested in his June 7, 1989, letter with regard to the assistance to be provided by SAS to Jaydon. The attorneys agreed on all the terms, and Baugh was to send Otero the final draft.

15. A month passed without word from Baugh and Otero sent him a reminder letter on July 10, 1989. On July 13, 1989, Otero received a telephone call from Jodi Firfer, another attorney at the law firm representing Jaydon, informing Otero that Baugh had left their firm. She said she was now handling the case and would forward to Otero the final draft of the settlement documents signed by Jaydon. However, on July 28, 1989, Firfer sent Otero a letter stating that Jaydon would not pay SAS any amounts pursuant to the Agreement. Prior to receiving this letter, Otero was never informed by Jaydon or its attorneys of any breach of the Agreement by SAS.

### Conclusions of Law

There is no material dispute of fact that the parties reached a legally enforceable settlement of the Lawsuit and that those terms are embodied in the Agreement. There also is no material dispute of fact that SAS performed all of its obligations under the Agreement. Specifically, SAS (i) timely provided Jaydon with a complete customer list for the affected areas, (ii) timely provided Jaydon with a complete employee list for all SAS personnel that

worked in Jaydon's area, (iii) gave Jaydon other information regarding some of SAS's customers in the affected areas, and (iv) contacted customers personally on Jaydon's behalf in accordance with all requests made by Jaydon. In spite of SAS's complete performance, Jaydon refused to sign the more specific document and failed to pay SAS any of the $40,000 which Jaydon agreed to pay in November, 1988.

## I. THE PARTIES REACHED AN ENFORCEABLE SETTLEMENT AGREEMENT

■ The Agreement is an enforceable contract between the parties which sets forth the essential terms of the settlement. Settlement agreements are highly favored by courts of law as public policy favors the efficiency and mutual benefit of compromise and thus will usually be enforced. *Robbie v. City of Miami,* 469 So.2d 1384, 1385 (Fla.1985). Settlement agreements are construed under the law as any other contract and the fact that an agreement may provide that a further more specific agreement will be entered into later does not affect the enforceability of the original agreement. *Schwartz v. Florida Board of Regents,* 807 F.2d 901, 905 (11th Cir.1987); *Bluevack, Inc. v. Walter E. Heller and Co. Company of Florida,* 331 So.2d 359, 360 (Fla. 3rd DCA 1976). A contract is not lacking in effect merely because it expresses the idea that something is left to a future agreement and such an agreement to agree is simply an agreement *in praesenti* to do it. *Innkeepers International, Inc. v. McCoy Motels, Ltd.,* 324 So.2d 676, 678 (Fla. 4th DCA 1975). The agreement to agree is enforceable if it is sufficiently specific to be capable of implementation and all the essential elements are set forth. *Robbie v. City of Miami,* 469 So.2d 1384, 1385 (Fla.1985); *Don L. Tullis and Associates, Inc. v. Benge,* 473 So.2d 1384, 1386 (Fla. 1st DCA 1985). However, not all details of such a future agreement need be set forth in order to make the agreement to agree enforceable. In *Robbie,* the Florida Supreme Court found a proposed settlement was enforceable although it did not provide for a contingency which later arose. *Robbie* at 1385. Similarly, in *Tullis,* the First District Court of Appeals enforced a settlement agreement although the agreement did not define a term that was to be used to compute the amount of the settlement. *Tullis* at 1386. The Court found that this term was not an essential element and it was acceptable that such a matter could be resolved by later agreement. *Tullis* at 1386.

■ Jaydon argues that the Agreement is not sufficiently specific to be enforceable. The Court rejects this argument. The Agreement sets forth all material and essential terms of the settlement and, as the courts in *Robbie* and *Tullis* found, not every contingency or element of the agreement must be set forth in order to have an enforceable agreement. The Agreement sets forth the amount of settlement and the obligations of the parties. Jaydon has not shown the essential absence of any element not covered by the Agreement.

Even if the Agreement was deficient in scheduling the essential elements of the settlement between SAS and Jaydon, all further details were later agreed to by the parties. By June 7, 1989, Otero and Baugh had agreed to all the terms of the Agreement. No further items, significant or otherwise, remained for agreement. The fact that all the remaining terms of the settlement were agreed to orally does not affect their enforceability. Under Florida law, oral settlement agreements are enforceable. *Dania Jai–Alai Palace, Inc. v. Sykes,* 495 So.2d 859, 862 (Fla. 4th DCA 1986); *Sockolof v. Eden Point North Condominium Association, Inc.,* 421 So.2d 716, 718 (Fla. 3rd DCA 1982). In *Dania,* the court found that an oral agreement between the parties' attorneys to execute mutual general releases was an enforceable settlement. *Dania* at 862. In *Dania,* the parties never entered into a written agreement nor did the oral agreement set forth specific terms but rather merely stated that certain mutual general release forms would be executed.

The cases cited by Jaydon in support of its position, *Goff v. Indian Lake Estates, Inc.,* 178 So.2d 910 (Fla. 2d DCA 1965) and

*Gaines v. Nortrust Realty Management, Inc.*, 422 So.2d 1037 (Fla. 3rd DCA 1982), are not persuasive. In *Goff,* the court found that the parties were merely negotiating and there was no meeting of the minds with respect to a settlement. *Goff* at 912. The execution of the formal settlement agreement was only contemplated, and the parties never reached a mutual agreement which could be enforced. *Goff* at 913. In *Gaines,* the court found that the parties had not reached a mutual understanding as to whether general or limited releases were to be executed, an essential element of the settlement, and therefore no enforceable agreement could exist. *Gaines* at 1040. The Florida Supreme Court in *Robbie* distinguished the *Gaines* case from that case because in *Gaines* there was absolutely no objective evidence to enable the court to discover the terms of the settlement. *Robbie* at 1386.

This proceeding is like the *Robbie* case in that the parties clearly reached a mutual understanding with respect to all essential elements of the settlement. The terms are evidenced in the Agreement. By June 7, 1989, the parties had agreed to each specific term as well. *Gaines* and *Goff* are rejected on this factual scenario.

## II. JAYDON IS ESTOPPED FROM DENYING THE ENFORCEABILITY OF THE SETTLEMENT

■ Jaydon is estopped from denying that it owes SAS $40,000 under the Agreement because SAS fully performed its obligations under the Agreement and Jaydon accepted those benefits. Courts in Florida have stated, "where a party accepts the benefits of a settlement agreement or a compromise ... and knows ... of the facts concerning that settlement, the party ratifies the settlement by accepting the benefits ... and he is thereafter estopped to attack the settlement." *Kisz v. Massry,* 426 So.2d 1009, 1011 (Fla. 2d DCA 1983); *Nagymihaly v. Zipes,* 353 So.2d 943, 944 (Fla. 3rd DCA 1978); *J. Allen, Inc. v. Castle Floor Covering,* 543 So.2d 249, 251 (Fla. 2d DCA 1989).

It is undisputed that SAS (i) timely provided Jaydon with a complete customer list for the relevant geographic areas, (ii) timely provided Jaydon with a complete employee list for all SAS personnel that worked in relevant areas, (iii) gave Jaydon other information regarding some of SAS's customers in the relevant areas, and (iv) contacted customers personally on Jaydon's behalf in accordance with all requests made by Jaydon. SAS completely performed its obligations under the settlement, and Jaydon accepted and received benefits. By this acceptance, Jaydon ratified the settlement and is estopped from denying the enforceability.

Further, SAS relied to its detriment on the existence of the settlement by (i) providing Jaydon with benefits, (ii) incurring expenses in connection with the settlement, (iii) foregoing the transfer of customers to an entity other than Jaydon, and (iv) giving up the opportunity to appeal the Summary Final Judgment Order. If the enforceability of the settlement is denied, Jaydon will have received all of the benefits and advantages of the settlement without performing corresponding obligations.

## III. PREJUDGMENT INTEREST

The sum of $40,000 has been due and owing since December 1, 1988, and SAS is entitled to prejudgment interest of 12 percent from that date, the date the debt was liquidated, until the present. *Cioffe v. Morris,* 676 F.2d 539, 543 (11th Cir.1982); *Argonaut Ins. Co. v. May Plumbing,* 474 So.2d 212, 214 (Fla.1985); *Tech Corp. v. Permutit Company,* 321 So.2d 562, 563 (Fla. 4th DCA 1975). The debt has been accruing prejudgment interest at the rate of $400 per month, and the amount of prejudgment interest owing as of November 30, 1990, is $9,600.

### Conclusion

1. SAS will receive final summary judgment for $40,000 in damages plus prejudgment interest of $9,600 for period from December 1, 1988, through November 30, 1990.

2. Motion for summary final judgment for defendant will be denied.