223 F.3d 1275 (11th Cir. 2000)
 MAZZONI FARMS, INC., a Florida corporation, Plaintiff-Appellant,
v.
E.I. DUPONT DE NEMOURS AND COMPANY, a Delaware corporation, d.b.a. Dupont, CRAWFORD & COMPANY, a Georgia Corporation, Defendants-Appellees.
JACK MARTIN GREENHOUSES, INC., f.k.a. M & M ORNAMENTALS, INC., and JACK MARTIN, Plaintiffs-Appellants,
v.
E.I. DUPONT DE NEMOURS AND COMPANY, d.b.a. Dupont, Defendant-Appellee.
 No. 97-5931, No. 97-5932.
 IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT.
 Aug. 22, 2000.
 
 Appeals from the United States District Court for the Southern District of Florida
 Before ANDERSON, Chief Judge, DUBINA and FAY, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiffs Mazzoni Farms and Jack Martin, commercial nurseries whose plants were allegedly damaged by a DuPont product called Benlate, appealed the district court's order dismissing their fraudulent inducement claims under Fed.R.Civ.P. 12(b)(6). Because the issues presented involved a choice-of-law provision for which there was no definitive Florida precedent, we certified the following two questions to the Supreme Court of Florida:
 
 
 2
 (1) Does a choice-of-law provision in a settlement agreement control the disposition of a claim that the agreement was fraudulently procured, even if there is no allegation that the choice-of-law provision itself was fraudulently procured?
 
 
 3
 (2) If Florida law applies, does the release in these settlement agreements bar plaintiffs' fraudulent inducement claims?
 
 
 4
 The Supreme Court of Florida has answered the first certified question in the affirmative and the second certified question in the negative, with respect to the plaintiffs whose causes of action are controlled by Florida law.[1] See Mazzoni Farms, Inc., v. E.I. DuPont De Nemours & Co., 761 So.2d 306, (Fla.2000). Moreover, the Delaware Supreme Court recently held that a release in a settlement agreement does not bar a nursery's claim for fraud in the inducement of the release. See E.I. DuPont De Nemours & Co. v. Florida Evergreen Foliage, 744 A.2d 457 (Del. 1999). Since the Supreme Court of Florida held that the Delaware choice-of-law provision in the settlement agreement controlled the disposition of the fraudulent inducement claim, the Delaware Supreme Court's opinion is binding on the parties.
 
 
 5
 In light of the Supreme Court of Florida's opinion, attached hereto as an appendix, as well as the Delaware Supreme Court's opinion, we reverse the district court's order dismissing the plaintiffs' claims and remand this case for further proceedings consistent with the Supreme Court of Florida's opinion.[2]
 
 
 6
 REVERSED and REMANDED.
 
 
 
 NOTES:
 
 
 [1]
 In an earlier order, this court consolidated the present appeals with appeals numbered 97-5696, 97-5697, 97-5698, 97-5699, and 97-5700. The present appeals (Nos. 97-5931 and 97- 5932) contain Delaware choice of law provisions, while some of the consolidated appeals do not. Accordingly, on July 20, 2000, this court entered an order unconsolidating the appeals, which means that this opinion affects appeals Nos. 97-5931 and 97-5932 only.
 
 
 [2]
 In a letter to this court, DuPont argues alternatively that this court can affirm the district court's order of dismissal because the plaintiffs, having settled claims of actual fraud against DuPont, could not have "justifiably relied" on any alleged misrepresentations or omissions by DuPont in connection with the settlement of their underlying claims. We note that the district court did not address this issue in its order, so neither do we. See Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); see also Baumann v. Savers Federal Sav. & Loan Ass'n, 934 F.2d 1506, 1512 (11th Cir. 1991) (courts generally will not address an issue that has not been decided by the trial court). On remand, the district court should consider DuPont's argument.
 ATTACHMENT
 APPENDIX
 MAZZONI FARMS, INC., etc., et al., Appellants,
 v.
 E. I. DuPONT DE NEMOURS AND COMPANY, etc., et al., Appellees.
 FOLIAGE FOREST, INC., etc., et al., Appellants,
 v.
 E. I. DuPONT DE NEMOURS AND COMPANY, etc., et al., Appellees.
 Nos. SC94846, SC95411
 Supreme Court of Florida
 June 8, 2000
 Certified Question of Law from the United States Court of Appeals for the Eleventh Circuit - Case Nos. 97-5931 & 97-5696
 Elizabeth K. Russo of Russo Appellate Firm, P.A., Miami, Florida, and Ferraro & Associates, P.A., Miami, Florida, for Appellants
 A. Stephens Clay, William H. Boice, and James F. Bogan, III of Kilpatrick Stockton LLP, Atlanta, Georgia; and Paul L. Nettleton of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Miami, Florida, for Appellees
 QUINCE, J.
 We have for review the following two questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit to be determinative of a cause pending in that court and for which there appears to be no controlling precedent.
 (1) DOES A CHOICE-OF-LAW PROVISION IN A SETTLEMENT AGREEMENT CONTROL THE DISPOSITION OF A CLAIM THAT THE AGREEMENT WAS FRAUDULENTLY PROCURED EVEN IF THERE IS NO ALLEGATION THAT THE CHOICE-OF-LAW PROVISION ITSELF WAS FRAUDULENTLY PROCURED?
 (2) IF FLORIDA LAW APPLIES, DOES THE RELEASE IN THESE SETTLEMENT AGREEMENTS BAR PLAINTIFFS' FRAUDULENT INDUCEMENT CLAIMS?
 We have jurisdiction. See art. V, 3(b)(6), Fla. Const. For the reasons discussed below, we answer the first certified question in the affirmative and the second certified question in the negative with respect to the plaintiffs whose causes of action are controlled by Florida law.
 This case involves the consolidated cases of Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 166 F.3d 1162 (11th Cir. 1999) and Foliage Forest, Inc. v. E.I. DuPont De Nemours & Co., 172 F.3d 1284 (11th Cir. 1999). The Mazzoni plaintiffs, Jack Martin Greenhouses (JMG) and Mazzoni Farms, Inc. (Mazzoni), and the Foliage plaintiffs, Foliage Forest, Inc. (Foliage), Castleton Gardens, Inc. (Castleton), Country Joe's Nursery, Inc. (Country Joe), Palm Beach Greenery, Inc. (PBG), and Morningstar Nursery, Inc. (Morningstar), are commercial plant nurseries who sued defendants, E.I. DuPont De Nemours and Company and Crawford & Company (DuPont), alleging that defendants fraudulently induced them into settling products liability claims for mass destruction of trees and plants in their nurseries. DuPont manufactures and sells to plant nurseries fungicides, including Benlate - the fungicide alleged to have caused property damage to plants in these nurseries.
 In the early 1990s, JMG and Mazzoni sued DuPont[1] asserting products liability claims based on property damage and actual fraud claims based on DuPont's alleged concealment of Benlate's defects.JMG and Mazzoni, however, settled these claims with DuPont. The settlement agreements released DuPont from all claims, whether known or unknown, and contained a choice-of-law provision stating that Delaware law governed the release.[2] The agreement further provided that the nurseries would not commence any action "based upon or in any way related to" the released claims. Mazzoni Agreement at 2, para. 3; JMG Agreement at 2, para. 3). In addition, the nurseries warranted that they "freely and voluntarily executed [the] release." Id. at 5, para. 10. Foliage and Castleton executed releases that were identical to the Mazzoni and JMG agreements.
 Morningstar, PBG, and Country Joe, however, executed releases that were different in two material respects. First, their agreements (hereinafter Morningstar Agreement, PBG Agreement, and Country Joe Agreement respectfully) did not contain a Delaware choice-of-law provision. Second, their agreements contained narrower release language. These nurseries discharged DuPont "from any and all claims, actions, causes of action, including consequential damages, demands, rights, damages, costs, losses, and any other liability or expense of whatsoever kind, which the undersigned . . . now has or may or shall have by reason of the use of or application of DuPont Benomyl products." Morningstar Agreement at 1; PBG Agreement at 1; Country Joe Agreement at 1.
 After executing the releases, the nurseries discovered information which led them to believe that DuPont intentionally concealed the value of the nurseries' claims to induce settlement. Specifically, the nurseries alleged that DuPont had discovered the perilous effects of Benlate in its field tests, destroyed the test plants and fields, and required all of the participants in the testing process to sign confidentiality papers. Based on these allegations of affirmative misrepresentation, the nurseries sued, claiming DuPont fraudulently induced them to execute the releases.
 Although the nurseries originally filed their suits in state court, DuPont removed the cases to federal district court based on diversity jurisdiction and moved for dismissal.[3] The district court in both Mazzoni and Foliage granted the motions to dismiss, finding the releases in the settlement agreements barred the fraudulent inducement claims. The district court held Florida law requires parties asserting fraudulent inducement claims to choose between an equitable or legal remedy. The district court further held the nurseries were unable to maintain the present actions because they ratified the settlement agreements by electing the legal remedy of damages instead of the equitable remedy of recission, a remedy which would haverequired them to return the settlement proceeds.
 The Foliage nurseries moved for reconsideration of the orders of dismissal and requested leave to file amended complaints. The proposed amended complaints included, among other things, alternative claims for rescission. The district court, however, denied both motions, reiterating that the settlement agreements precluded the fraudulent inducement claims. The court further noted the alternative rescission claims were defective because the nurseries failed to state they would return the settlement proceeds.
 The nurseries subsequently appealed the cases to the Eleventh Circuit. In Mazzoni, the Eleventh Circuit recognized that although the choice-of-law provision would be enforceable under section 201 of the Restatement (Second) of Conflict of Laws ("Restatement"),[4] no Florida court had considered section 201. See Mazzoni, 166 F.3d at 1164. Further, the court recognized that while Florida courts applied reasoning analogous to the Restatement's approach in construing arbitration clauses, those cases were distinguishable because of their reliance on federal policy favoring arbitration. See id. As a result, the Eleventh Circuit concluded that Mazzoni involved questions of state law for which there was no definitive controlling precedent. Accordingly, the Eleventh Circuit certified the relevant questions to this Court. See id. at 1165. Another panel of the Eleventh Circuit, acknowledging the prior Mazzoni certification, consolidated Foliage with Mazzoni, and certified the same questions. See Foliage, 172 F.3d at 1285. The questions as certified by the Eleventh Circuit are:
 (1) DOES A CHOICE-OF-LAW PROVISION IN A SETTLEMENT AGREEMENT CONTROL THE DISPOSITION OF A CLAIM THAT THE AGREEMENT WAS FRAUDULENTLY PROCURED, EVEN IF THERE IS NO ALLEGATION THAT THE CHOICE-OF-LAW PROVISION ITSELF WAS FRAUDULENTLY PROCURED?
 (2) IF FLORIDA LAW APPLIES, DOES THE RELEASE IN THESE SETTLEMENT AGREEMENTS BAR PLAINTIFFS' FRAUDULENT INDUCEMENT CLAIMS?
 Mazzoni, 166 F.3d at 1165; Foliage, 172 F.3d at 1287. If the answer to the first question is in the affirmative, upholding the choice-of-law provision, that answer becomes dispositive for Mazzoni, JMG, Foliage, and Castleton because these nurseries signed settlement agreements with a Delaware choice-of-law provision. In that event, the second question, concerning fraudulent inducement under Florida law, need not be resolved for the Mazzoni plaintiffs. If, however, the answer to the first question is in the negative, then we must also answer the second question with regard to these plaintiffs. The second question must be addressed in either event for Country Joe, PBG, and Morningstar because their agreements do not contain a choice-of-law provision in favor of Delaware law. Accordingly, Florida law automatically applies to these three plaintiffs.
 I. Certified Question I
 At the outset, we acknowledge the Eleventh Circuit's statement that its "sterile phrasing of the issues need not preclude [us] from inquiring into the specifics of these cases." See Mazzoni, 166 F.3d at 1165. That being said, we recognize that the nurseries elected to affirm rather than rescind the settlement agreements. Consequently, we restrict the inquiry of the first certified question to situations where the parties have elected to affirm the contract and sue for damages. Thus, we have rephrased the first certified question to read:
 (1) DOES A CHOICE-OF-LAW PROVISION IN A SETTLEMENT AGREEMENT CONTROL THE DISPOSITION OF A CLAIM THAT THE AGREEMENT WAS FRAUDULENTLY PROCURED IF THE DEFRAUDED PARTY HAS ELECTED TO AFFIRM THE CONTRACT AND SUE FOR DAMAGES?
 As a threshold matter, the nurseries contend that the Court need not answer the first certified question. They offer the following syllogism: because DuPont did not specify the basis in Delaware law or the differences between Delaware law and Florida law,[5] there is a legal presumption that Delaware law is the same as Florida law, and therefore Florida law applies. The nurseries further assert that both Matsuura v. Alston & Bird, 166 F.3d 1006 (9th Cir. 1999), and Fuku-Bonsai, Inc. v. E.I. DuPont de Nemours & Co., 187 F.3d 1031 (9th Cir. 1999), interpreted Delaware law to provide for an election of remedies between rescission and suing for damages. Because Florida law similarly provides for an election of remedies, they argue that Florida law, not Delaware law, should apply.
 Apparently, the nurseries have misinterpreted the law by incorrectly relying on cases where choice-of-law provisions did not govern the dispute. See Gustafson v. Jensen, 515 So. 2d 1298 (Fla. 3d DCA 1987) (applying Florida law to determine the enforceability of a premarital agreement executed in Denmark); Coyne v. Coyne, 325 So. 2d 407 (Fla. 3d DCA 1976) (determining whether an appearance was made in a California divorce proceeding). Contrary to the nurseries' assertions, courts have uniformly enforced choice-of-law provisions without requiring the parties to brief the law of the chosen forum. See, e.g., Continental Mortgage Investors v. Sailboat Key, Inc., 395 So. 2d 507, 513-14 (Fla. 1981). Moreover, it is incumbent upon the party seeking to avoid enforcement of the provision to show that the foreign law contravenes public policy of the forum jurisdiction. See Delhomme Indus., Inc. v. Houston Beechcraft, Inc., 669 F.2d 1049, 1058 (5th Cir. 1982) ("A choice of law provision in a contract is presumed valid until it is proved invalid. The party who seeks to prove such a provision invalid because it violates public policy bears the burden of proof.") In short, DuPont is neither required to brief the substantive law of Delaware nor obliged to demonstrate conflict between Delaware and Florida law; on the contrary, the choice-of-law provision is presumptively valid and it is the nurseries' burden to demonstrate why it should not be enforced. Therefore, the nurseries' contentions are without merit, and the first certified question is properly raised before this Court.
 Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.[6]See Punzi v. Shaker Adver. Agency, Inc., 601 So. 2d 599 (Fla. 2d DCA 1992). The nurseries contend that enforcing the choice-of-law provision would enable DuPont to contract against liability for fraud, thereby violating Florida public policy. DuPont, however, insists that the countervailing public policy must be fundamental, and that the countervailing policies in the instant case do not outweigh the policy of protecting the expectations of contracting parties.
 DuPont bolsters its position by alluding to usury cases in which this Court held that the policy disfavoring usurious interest rates could not override explicit contractual terms. See Burroughs Corp. v. Suntogs of Miami, Inc., 472 So. 2d 1166 (Fla. 1985); Morgan Walton Properties, Inc. v. International City Bank & Trust Co., 404 So. 2d 1059 (Fla. 1981) (upholding a choice-of-law provision even though the parties' purpose in making it was to avoid the restrictive effects of Florida law); Continental, 395 So. 2d at 507. This Court in Continental elucidated the public policy exception by identifying four factors that indicate whether the countervailing policy overrides the expectations of contracting parties: whether the statute evincing the policy is fraught with exceptions; whether the statute is frequently amended, thereby reflecting a flexible public policy; whether the policy is fundamental to the legal system; and whether the outcome has a limited effect upon the contract. See also Burroughs, 472 So. 2d at 1168 (discussing Continental). The court in Burroughs applied these factors in the statute of limitations context and similarly concluded that the contractual provision shortening the statutory filing period was not contrary to strong public policy.
 In determining whether contractual provisions violate public policy, courts have also considered this directive:
 Courts . . . should [proceed with] extreme caution when called upon to declare transactions as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it is made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental policy of the right to freedom of contract between parties sui juris.
 Pizza U.S.A. of Pompano Inc. v. R/S Assocs. of Fla., 665 So. 2d 237, 239 (Fla. 4th DCA 1995) (quoting Bituminous Casualty Corp. v. Williams, 154 Fla. 191, 197, 17 So. 2d 98, 101-02 (1944)). The court in Punzi applied a less stringent standard when it said:
 The fact that the law of the forum state is different than the law of the foreign state does not mean that the foreign state's law necessarily is against the public policy of the forum state. Instead, it is proper for the court to ascertain whether the foreign state's law is harmonious in spirit with the forum state's public policy.
 Punzi, 601 So. 2d at 600 (citation omitted). Although courts have adopted varied formulations, the underlying principle remains the same: the countervailing public policy must be sufficiently important that it outweighs the policy protecting freedom of contract. Thus, to the extent that DuPont's "fundamental public policy" argument is consistent with this principle, it is correct in its assertion that routine policy considerations are insufficient to invalidate the choice-of-law provision.
 As DuPont suggests, the nurseries' reliance on covenant-not-to-compete cases to demonstrate overriding public policy is misplaced. Indeed, the distinctive character of covenant not to compete claims, which are vigorously disfavored by Florida courts, diminishes its applicability in other contexts. As the court in Continental noted, covenants not to compete "do not help us understand the strength of the very different policies underlying the usury laws." Continental, 395 So. 2d at 510. The Court further noted in footnote 5 of the Continental decision that even in a covenant-not-to-compete case, Davis v. EbscoIndustries, Inc., 150 So. 2d 460 (Fla. 3d DCA 1963), the court applied the law chosen by the parties.
 The nurseries correctly recognize that this Court's decision in HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238 (Fla. 1996), articulated Florida's public policy against fraudulent conduct:
 [T]he interest protected by fraud is society's need for true factual statements in important human relationships, primarily commercial or business relationships. More specifically, the interest protected by fraud is a plaintiff's right to justifiably rely on the truth of a defendant's factual representation in a situation where an intentional lie would result in loss to the plaintiff.
 Id. at 1240 (quoting Woodson v. Martin, 663 So. 2d 1327, 1330 (Fla. 2d DCA 1996) (Altenbernd, J., dissenting)). The nurseries further contend that Florida public policy disallows the enforcement of contracts where parties have contracted against liability for their own fraud or other intentional torts. See Oceanic Villas v. Godson, 148 Fla. 454, 4 So. 2d 689 (1941); Mankap Enter., Inc. v. Wells Fargo Alarm Servs., 427 So. 2d 332, 333-34 (Fla. 3d DCA 1983) ("The law is settled that a party cannot contract against liability for his own fraud in order to exempt him from liability for an intentional tort, and any such exculpatory clauses are void as against public policy."); Goyings v. Jack & Ruth Eckerd Found., 403 So. 2d 1144 (Fla. 2d DCA 1981).
 Yet, DuPont maintains that parties are encouraged to settle claims involving wrongdoing, and that parties are only prohibited from contracting against liability for future, not past, intentional wrongdoings. Indeed, the Court in Cerniglia v. Cerniglia, 679 So. 2d 1160, 1164-65 (Fla. 1996), enforced a general release in a marital settlement agreement despite the party's common law fraud claim based on nondisclosure of financial assets. Moreover, the policy interests underlying settlement agreements are not commensurate with those underlying exculpatory clauses. As one court explained:
 Plaintiffs also claim the releases should be void as against public policy, because they seek to absolve a party from liability for an intentional tort (i.e., wrongful discharge). All authorities cited by plaintiffs address the enforceability of exculpatory clauses which operate prospectively. The court is aware of no authority in Kansas or elsewhere which would void the release of past intentional torts on public policy grounds. In fact, the law of Kansas highly favors the settlement of past claims, whether they are based on intentional or negligence actions.
 White v. General Motors Corp., 699 F. Supp. 1485, 1488 (D. Kan. 1988). Thus, the nurseries' reliance on a rationale applicable to exculpatory clauses is not entirely dispositive of the issue before the Court. While we both recognize and reaffirm Florida's policy disfavoring fraudulent conduct, we are mindful of the rigorous standard employed in determining whether to invalidate choice-of-law provisions. Accordingly, we hold that enforcement of the choice-of-law provision is not so obnoxious to Florida public policy as to render it unenforceable.
 Because the nurseries do not fall within the narrow public policy exception, they are bound by the choice-of-law provision since they have elected to affirm the contract instead of seeking rescission. It is axiomatic that fraudulent inducement renders a contract voidable, not void. See Columbus Hotel Corp. v. Hotel Management Co., 116 Fla. 464, 477, 156 So. 893, 898 (1934). Consistent with the majority view, Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract. See Deemer v. Hallett Pontiac, Inc., 288 So. 2d 526, 528 (Fla. 3d DCA 1974). A prerequisite to rescission is placing the other party in status quo. See Lang v. Horne, 156Fla. 605, 615, 23 So. 2d 848, 853 (1945). As the court in Bass v. Farish, 616 So. 2d 1146, 1147 (Fla. 4th DCA 1993), noted, "Generally, a contract will not be rescinded even for fraud when it is not possible for the opposing party to be put back into his pre-agreement status." Moreover, a party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission. See Rood Co. v. Board of Pub. Instruction, 102 So. 2d 139, 141-42 (Fla. 1958).
 A damages claim, by contrast, affirms the contract, and thus ratifies the terms of the agreement. See Hauser v. Van Zile, 269 So. 2d 396, 398-99 (Fla. 4th DCA 1972). This principle ensures that a party who "accepts the proceeds and benefits of a contract" remains subject to "the burdens the contract places upon him." Fineberg v. Kline, 542 So. 2d 1002, 1004 (Fla. 3d DCA 1988); see also Head v. Lane, 495 So. 2d 821, 824 (Fla. 4th DCA 1986) (noting that a party who "accepts the benefits" of a transaction is "estopped" from "repudiating the accompanying or resulting obligation").
 As previously stated, the necessary precondition for rescission is tender of the benefits received under the contract. In effect, the nurseries elected to affirm the contract by not returning the settlement proceeds. As a result, they are bound by the terms of the contract, including the choice-of-law provision.[7] Thus, we hold that the choice-of-law provision is operative and, therefore, Delaware law governs the Mazzoni, JMG, Foliage, and Castleton disputes. Accordingly, we answer the first certified question, with our attendant modifications, in the affirmative.
 II. Certified Question II
 IF FLORIDA LAW APPLIES, DOES THE RELEASE IN THESE SETTLEMENT AGREEMENTS BAR PLAINTIFFS' FRAUDULENT INDUCEMENT CLAIMS?
 The second certified question must still be answered with respect to Morningstar, PBG, and Country Joe. The nurseries contend that the language used in the releases restricts their effect to actions arising directly from the use of DuPont's allegedly defective product. DuPont, however, contends that the releases are sufficiently broad to bar the nurseries' fraudulent inducement claims.
 Generally, Florida courts enforce general releases to further the policy of encouraging settlements. Numerous Florida cases have upheld general releases, even when the releasing party was unaware of the defect at the time the agreement was executed. See Hardage Enters., Inc. v. Fidesys Corp., N.V., 570 So. 2d 436 (Fla. 5th DCA 1990) (enforcing a general release even though the party discovered the negligence after executing the release); Braemer Isle Condominium Ass'n, Inc. v. Boca Hi, Inc., 632 So. 2d 707 (Fla. 4th DCA 1994) (enforcing general release although party did not discover alleged defects until after executing the release). More importantly, other courts have recognized this principle even in the face of a fraudulent inducement claim. For example, in Kobatake v. E.I. DuPont De Nemours & Co., 162 F.3d 619, 625 (11th Cir. 1998), the court held that the "execution of such all-encompassing releases prohibits [plaintiffs] from suing defendants [for fraudulent inducement]." Similarly, the court in Cerniglia held that the release in a marital settlement agreement barred subsequent attacks based on fraud.[8] Cerniglia, 679So. 2d at 1164. Likewise, the court in Dresden v. Detroit Macomb Hospital Corp., 553 N.W. 2d 387 (Mich. Ct. App. 1996), construed a release for "any and all" causes of action as barring a fraudulent inducement claim.
 Other courts, however, have interpreted releases narrowly. For example, although the release at issue in Hold v. Manzini, 736 So. 2d 138, 141 (Fla. 3d DCA 1999), discharged the party from claims "upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day of these presents," the court held that the release did not bar any claims accruing after the date of execution. Similarly, the court in Floyd v. Homes Beautiful Construction Co., 710 So. 2d 177, 178 (Fla. 1st DCA 1998), addressed an agreement releasing the party from "any claim or cause of action presently existing, whether known or unknown, including but not necessarily limited to the [1986 civil suit]." In construing the release, the court stated, "It is not apparent from the four corners of the release what 'claims' the parties intended to release." Id. at 179. The court further noted that it was unclear whether
 the modifying language "presently existing" bars a cause of action relating to a defect in existence at the time of execution of the release, but unknown to the parties; or rather, whether that modifying language limits the release to causes of action fully accrued at the time of execution.
 Id. Likewise, the court in Quarterman v. City of Jacksonville, 347 So. 2d 1036 (Fla. 1st DCA 1977), narrowly interpreted seemingly broad language in a release. The Quarterman release discharged the parties identified in the release and "any and all other persons . . . who might be liable of and from any and all actions." Id. at 1037 n.1. Notwithstanding this language, the court admitted parol evidence to determine whether the release discharged potential defendants who were not expressly listed in the release. See id. at 1039. Thus, the courts' willingness to enforce general releases is not absolute. Rather, enforcement is premised upon the assumption that the released claims are those that were contemplated by the agreement.
 In the instant case, the nurseries emphasize that the Morningstar, PBG, and Country Joe agreements only released claims they had "by reason of the use or application of DuPont Benomyl products." (Morningstar Agreement at 1; PBG Agreement at 1; Country Joe Agreement at 1). DuPont, however, focuses on the broad release language: DuPont is discharged "from any and all claims, actions, causes of action, including consequential damages, demands, rights, damages, costs, losses, and any other liability or expense of whatsoever kind, which the undersigned . . . now has or may or shall have by reason of the use of or application of DU PONT BENOMYL products." (Morningstar Agreement at 1; PBG Agreement at 1; Country Joe Agreement at 1).
 Similar to the Cerniglia and Kobatake agreements, the nurseries' releases cover "any and all claims . . . of whatsoever kind." Nevertheless, the "any and all claims . . . of whatsoever kind" is qualified later with the statement "shall have by reason of the use of or application of [Benlate]." The fraudulent inducement claim does not arise from the use or application of Benlate. Thus, the seemingly broad language does not bar the nurseries' present claims.
 Unlike the nurseries' releases, the Cerniglia agreement specifically precluded the claims that were being asserted. In Cerniglia, the fraud claim was based on nondisclosure of financial assets; however, the parties relinquished "all claims of whatever nature . . . to any assets/property. . . of whatever kind." Cerniglia, 679 So. 2d at 1164 n.4. The nurseries' releases, by contrast, do not specifically preclude fraudulent inducement claims. Despite the use of general language in Floyd, the court identified ambiguity in the statement "presently existing, whether known or unknown." Floyd, 710 So. 2d at 178. Similarly, the general language in the Morningstar, PBG, and Country Joe releases is circumscribed by the specific language limiting the released claims to those pertaining to the "use or application of [Benlate]."
 Although the language in the Quarterman case releasing "any and all other persons" was more general than the releases at issue, the court was still reluctant to construe the release broadly. Certainly, the restrictive Quarterman approach is warranted here where the releases are significantly narrower in scope. Further, while the court in Dresden enforced a release for "any and all" causes of action that could have arisen out of the original claim or in any matter related to the releasing party, that release was far more general than the Morningstar, PBG and Country Joe agreements. The limitation in the nurseries' releases distinguishes Dresden from the instant case. Likewise, the release in Hardage discharged the party from liability "for or because of any matter or thing done, omitted, or suffered to be done . . . and in any way directly or indirectly arising out of the . . . agreement . . . and all of the transactions and occurrences above-described." Hardage, 570 So. 2d 436, 437 (Fla. 5th DCA 1990). Unlike the Morningstar, PBG, and Country Joe releases, the Hardage release barred claims that arose directly or indirectly out of the agreement. This "indirect" aspect of the Hardage release demonstrates the breadth that is lacking in the nurseries' releases. In short, the provision in the Morningstar, PBG, and Country Joe releases that limits the released claims to those accruing "by reason of the use or application of [Benlate]" is not sufficiently broad to bar the present fraudulent inducement claims.
 DuPont maintains that the nurseries' claims are entirely dependent on their use of Benlate because the misrepresentation claim concerns the value of the original claim and the damages sought are necessarily dependent on their use of Benlate. Although DuPont's alleged misrepresentation of the value of the nurseries' claims may be construed as relating to the product liability claims, this argument is unpersuasive because there is an inherent disconnection between inducement into settlement and pursuit of the original claims. As the Matsuura court acknowledged, broadly interpreting the releases is "a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." Matsuura, 166 F.3d at 1010 (quoting California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 335 (1997) (Scalia, J., concurring)).
 In sum, we hold the Delaware choice-of-law provision in the settlement agreements governs the Mazzoni, JMG, Foliage and Castleton releases because the plaintiffs chose the remedy of damages and thereby ratified the agreement. Because there was no choice-of-law provision in the Morningstar, PBG, and Country Joe settlement agreements, those releases are governed by Florida law, and Florida law does not bar the nurseries' fraudulent inducement claims.[9] Accordingly, we answer the first certified question, asamended, in the affirmative and the second certified question in the negative with regard to the plaintiffs subject to Florida law.
 It is so ordered.
 HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
 Notes:
 
 
 [1]
 The Foliage plaintiffs, unlike the Mazzoni plaintiffs, executed the releases without filing suit against DuPont.
 
 
 [2]
 The settlement agreements between Mazzoni and DuPont (hereinafter the Mazzoni Agreement) and between JMG and DuPont (hereinafter the JMG Agreement) provide, in pertinent part:
 In consideration of Defendant's payment of the amount set forth in the authorization previously signed by Plaintiff, Plaintiff hereby releases Defendant from any and all causes of action, claims, demands, actions, obligations, damages, or liability, whether known or unknown, that Plaintiff ever had, now has, or may hereafter have against Defendant, by reason of any fact or matter whatsoever, existing or occurring at any time up to and including the date this Release is signed (including, but not limited to, the claims asserted and sought to be asserted in the Action).
 . . . .
 . . . This Release shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to the conflict of laws or choice of law provisions thereof.
 Mazzoni Agreement at 2, para. 1, at 6, para. 15; JMG Agreement at 2, para. 1, at 6, para. 15.
 
 
 [3]
 Given the procedural posture of the cases, the allegations in the nurseries' complaints must be taken as true. See, e.g., Lincoln Tower Corp. v. Dunhalls-Florida, Inc., 61 So. 2d 474, 474 (Fla. 1952) ("In considering the motion to dismiss, all allegations . . . must be taken as true.").
 
 
 [4]
 Section 201 provides: "The effect of misrepresentation, duress, undue influence and mistake upon a contract is determined by the law selected by application of the rules of 187-188." Restatement (Second) of Conflict of Laws 201 (1971). The comment to section 201 states:
 Id. cmt. c. The comment to section 187 states: "A choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation. . . ." Id. 187, cmt. b.
 The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily means [sic] that a choice-of-law provision contained therein will be denied effect. This will only be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision. . . . Otherwise, the choice-of-law provision will be given effect provided that it meets the requirements of 187.
 
 
 [5]
 The Delaware Supreme Court recently resolved the second certified question, whether under Delaware law the release in these settlement agreements bar plaintiffs' fraudulent inducement claims, by holding a release of a fraudulent inducement claim must be done with specificity. See E.I. DuPont De Nemours & Co. v. Florida Evergreen Foliage, 744 A. 2d 457 (Del. 1999).
 
 
 [6]
 Choice-of-law provisions are authorized by statute. Section 671.105(1), Florida Statutes (1999), provides: "[W]hen a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."
 
 
 [7]
 We reiterate that because the nurseries have elected to affirm the contract, we do not have the occasion to consider whether the choice-of-law provision would remain operative if they had instead sought rescission. Additionally, while we recognize that affirmance entails ratification of the terms of the agreement, we express no opinion as to whether parties electing to affirm a contract will also be bound by releases which are sufficiently broad to bar fraudulent inducement claims.
 
 
 [8]
 The release provision of the Cerniglia settlement agreement provided that the parties relinquished "all claims of whatever nature each may have had in or to any assets/property or estate of whatever kind, now or hereafter owned or possessed by the other, [recognizing that the parties intend] that this paragraph shall constitute a complete, general, and mutual release of all claims whatsoever." Cerniglia, 679 So. 2d at 1164 n. 4.
 
 
 [9]
 Because we conclude that the release language was not sufficiently broad to bar the nurseries' fraudulent inducement claims, we need not address whether fraudulent inducement claims would still be barred in a release that was more general in scope. Further, we need not consider whether, in the event that the releases did bar fraudulent claims, the nurseries would be permitted to depart from well-settled remedial principles by retaining the money, affirming the contract, and concomitantly avoiding the binding effect of the releases.