In re AIR SAFETY INTERNATIONAL, L.C. and Camber Flight Simulation, L.C., Debtors.

GMGRSST, Ltd., Appellant,

v.

Deborah Menotte, Appellee.

No. 05–80642–CIV.

United States District Court, S.D. Florida.

Dec. 2, 2005.

Craig P. Rieders, Esq., Miami, FL, for GMRSST, Ltd.

Michael Bakst, Esq., West Palm Beach, FL, for Deborah Menotte, Appellee.

Roger C. Hurd, Esq., Palm Beach Gardens, FL, for Joe G. Coykendall, Appellee.

Donald Wright, Esq., Birmingham, AL, for Camber Corporation, Appellee.

GOLD, District Judge.

## ORDER AFFIRMING MEMORANDUM OPINION IN PART/REVERSING MEMORANDUM OPINION IN PART

**THIS CAUSE** is before the Court upon the appeal filed by GMGRSST, Ltd. ("Appellant") on July 15, 2005, which seeks to reverse the Bankruptcy Court's Memorandum Opinion Granting Amended Motion To Approve Stipulation To Compromise Controversy Between Trustee And Equity Holders; And To Make Distribution Of Equity Holders And Denying GMGRSST,

Ltd.'s Motion To Compel Trustee To Distribute Surplus Assets To The Debtor Pursuant To 11 U.S.C. § 726(a)(6) (the "Memorandum Opinion") [DE 1]. On August 16, 2005, several parties filed opposition briefs, including the Trustee, Deborah Menotte, (the "Trustee"), Joe G. Coykendall ("Coykendall"), and Camber Corporation ("Camber") (Trustee, Coykendall, and Camber sometimes referred to collectively as "Appellees") [DE 6, 8, and 9, respectively]. On September 2, 2005, Appellant filed its reply brief [DE 16]. On November 4, 2005, I heard oral argument on the merits of the appeal. Based on the reasons explained below, I affirm the Memorandum Opinion issued by the Bankruptcy Court in part, and I reverse it in part.

## I. FACTS

### A. The Debtor And The Lockheed Martin Settlement

On September 23, 1999, Air Safety International, L.C. ("Air Safety") filed a voluntary Chapter 11 petition for bankruptcy, Case Number 99–36290–BKC–SHF. While operational, Air Safety had been engaged in flight training activities, and Alan Madsen ("Madsen") was its chairman and manager, A. Patrick McSweeney ("McSweeney") was its president, and Coykendall was its chief financial officer.

On January 11, 2000, Camber Flight Simulation, L.C. ("CFS") filed a voluntary Chapter 11 petition for bankruptcy, Case Number 00–30087–BKC–SHF. On February 25, 2000, the Bankruptcy Court entered an Order to jointly administer both cases (the term "Debtor," where used, refers to Air Safety and CFS together).[1] On March 21, 2000, the cases were converted to ones under Chapter 7. On March 24, 2000, the Bankruptcy Court appointed the Trustee to administer the joined cases.

The Debtor's estate had only one significant asset: a piece of litigation against Lockheed Martin Corporation ("Lockheed Martin"). The Trustee settled the litigation with Lockheed Martin for $10,000,000, and the Bankruptcy Court approved the settlement on February 14, 2002 (the "Lockheed Martin Settlement").

### B. Settlement Of Claims

Following the Lockheed Martin Settlement, numerous parties filed requests for payment of administrative expenses for their efforts in helping the Trustee settle the Lockheed Martin litigation, including Alan and Becky Madsen,[2] who moved to allow an administrative expense in the amount of $292,400, plus $7,283.34 for travel and related expenses. On April 29, 2002, the Bankruptcy Court issued an Order allowing reimbursement to the Madsens in the amount of their travel expenses only.

Around the same time, Coykendall asserted an entitlement to 3% of the Lockheed Martin Settlement amount. Coykendall alleged that he was hired by Richard Brown, one of the Debtor's engaged special counsel, to provide consulting services on behalf of Air Safety, and that Madsen himself had approved the arrangement for payment of his fees.

The Lockheed Martin Settlement had the welcome effect of supplying the estate with enough money to satisfy all of the Debtor's creditors. The Trustee began the process of analyzing claims for purposes of making distributions from the

---

1. The Appellant in this action is a family limited partnership that owns an interest in a trust that controls a large percentage equity interest in the Debtor.

2. Alan and Becky Madsen are sometimes referred to collectively as the "Madsens."

proceeds of the Lockheed Martin Settlement.

On May 21, 2002, the Trustee filed an amended objection to a claim by McSweeney for a ten percent ownership interest in the Debtor. The Trustee argued that the Debtor's books and records failed to indicate an equity interest for McSweeney. Moreover, the Trustee argued that McSweeney's own tax returns failed to mention the purported equity interest in the Debtor. Nearly two years later, on March 26, 2004, the Bankruptcy Court sustained the Trustee's objection (the "McSweeney Order").[3] On March 30, 2004, McSweeney filed an Emergency Motion To Vacate The Bankruptcy Court's Order Sustaining Trustee's Amended Objection to his claim.

In the meantime, the parties began to engage in settlement discussions in the hopes of resolving all remaining disputes between them. In addition to the administrative claims sought by Madsen and Coykendall, a number of other parties asserted unsecured claims. For instance, GMGRSST d/b/a ABM Investment ("ABM") and Madsen Automotive Group ("MAG") asserted joint claims in the amount of $1.1 million.[4] Camber asserted claims in excess of $1.3 million, plus an equity interest in Air Safety. Robert King ("King"), either individually or through MSR, Inc., filed a proof of claim in the amount of $888,000, plus an equity interest in Air Safety.

On April 25, 2002, and July 10, 2002, the Debtor, the Trustee, the Madsens, Appellant, MAG, Coykendall, MSR, King, Camber, and their respective legal representatives engaged in settlement discussions, and by July 17, 2002, all of the above parties had signed a Stipulation for Settlement (the "Stipulation") that resolved all of the remaining issues in the case.[5] The Stipulation acknowledged the fact that each of the claims represented therein was or would have been the subject of objections from other Parties to the Stipulation.

The Parties agreed that the purpose of their concerted efforts was to resolve their disputes, including those relating to equity interests. Stipulation, p. 2, ¶ 6. They also agreed to a dual-faceted approach to distributing money from the Debtor's estate. First, they agreed to support an order from the Bankruptcy Court awarding general unsecured claims in the following amounts: $617,000 to Camber, $138,000 to MSR, $901,000 to ABM, $199,000 to MAG, and $65,000 to King (this portion of the Stipulation to be referred to as "Phase One Distributions"). Stipulation, p. 3, ¶ 8. Second, they agreed to support an order of the Bankruptcy Court that said the following:

> after payment of all other allowed claims against this Estate in full, the first $2,280,000 of the remaining funds shall be distributed by the Trustee to the following Parties based upon the following percentages: the Madsens shall receive 53.48%; Camber shall receive 13.13%; King shall receive 26.75%; and Coykendall shall receive 6.57%. All sums greater than the first $2,280,000 shall be

---

3. As part of the McSweeney Order, the Bankruptcy Court determined that Air Safety was comprised of four members. After taking into account a typographical error, it was determined that the equity holders maintained the following interests in Air Safety: GMGRSST (84%), King (7.5%), Camber (7.5%), and Madsen (1%).

4. At oral argument, counsel for Appellant represented that ABM is a management company that does business under Appellant's name, and MAG is one of Appellant's subsidiaries.

5. The term "Party" and "Parties" shall be used to refer to the signatories to the Stipulation.

distributed by the Trustee to the following Parties based upon the following percentages: Madsens shall receive 79.4155%; Camber shall receive 14.0145%; King shall receive 0%; and Coykendall shall receive 6.57%. It is also agreed that the Madsens shall be entitled to an assignment from the Trustee, at the close of the case, of the remaining assets of the Debtors, including the right to use the names of the Debtors, exclusive of Camber Flight, the goodwill, and any remaining unadministered intellectual property. Such assignment shall be only of the Trustee's right, title and interest, without warranties or representations of any type, 'as is, where is'. (This portion of the Stipulation to be referred to as "Phase Two Distributions"). *Id.,* pp. 3–4, ¶ 10. The Parties further agreed that they would cooperate with the Trustee in closing the cases, and that they understood the agreement was "contingent upon the Trustee's objection to the equity claim of Patrick McSweeney being sustained whereby the Court would find that Patrick McSweeney does not hold any equity interest within the Debtors." *Id.,* p. 4, ¶ 11. Finally, the Parties acknowledged that the Stipulation was the "entire understanding and agreement of the Parties, and [that] there are no prior or contemporaneous promises, representations, agreements, warranties, or undertakings by any Party to the other, either oral or written of any character or nature, except as set forth in this Stipulation." *Id.,* ¶ 12.

On May 27, 2004, the Parties filed a Joint Motion To Approve Compromise And Settlement Of Certain Unsecured Claims; Joint Motion To Commence Immediate Interim Distribution regarding the Phase One Distributions (the "Joint Motion"). In it, the movants sought an order allowing the Phase One Distributions. The parties attached the Stipulation to their Joint Motion, noting that they were "not seeking any distribution to equity nor any determination by the Court as to the possible respective equity interest of the Joint Movant claimants" because McSweeney's claim remained pending.

Sometime thereafter, the Trustee settled with McSweeney for $50,000. On August 2, 2004, the Bankruptcy Court entered an Order granting the Joint Motion; it allowed the Phase One Distributions in their entirety. On August 6, 2004, the Trustee moved to approve the settlement with McSweeney. On October 5, 2004, the Bankruptcy Court entered an Order that authorized the Trustee to make the Phase One Distributions, and a payment of $50,000 to McSweeney.

## C. The Motion To Compel And Motion To Distribute

Everything had proceeded according to the terms of the Stipulation until November 8, 2004, when Appellant filed a Motion to Compel Trustee To Distribute Surplus Assets to The Debtor Pursuant to 11 U.S.C. § 726(a)(6) (the "Motion to Compel"). In it, Appellant asked the Bankruptcy Court to return the remaining assets in the estate (the so-called "surplus") to the owners according to their equity percentages per § 726(a)(6), and to compel the Trustee to reinstate Air Safety, which had been administratively dissolved for failure to file an annual report. The Motion to Compel neglected to mention the Stipulation at all; indeed, it ignored the subject entirely, referencing the Court's October 5, 2004 Order authorizing Phase One Distributions only to establish that funds remained in the Debtor's coffers.

Shortly thereafter, on November 12, 2004, the Trustee filed a Motion To Approve Stipulation To Compromise Controversy Between The Trustee And Equity Holders; And To Make Distribution To Equity Holders (the "Motion to Distrib-

ute"); in other words, the Trustee sought to process the Phase Two Distributions. The Trustee attached the Stipulation to the Motion to Distribute, mentioning that she had not sought approval when she moved for authorization of the Phase One Distributions because the McSweeney claim was pending at the time. She argued that the Stipulation met the Eleventh Circuit test of reasonableness set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1549 (11th Cir.1990), *cert. denied,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990).

On March 30, 2005, the Bankruptcy Court heard oral argument on both Appellant's Motion to Compel and the Trustee's Motion to Distribute. Although the Parties presented their motions separately, the issues intersected frequently throughout the hearing. The Parties submitted written closing arguments to the Bankruptcy Court on April 13, 2005. On June 2, 2005, the Bankruptcy Court issued its Memorandum Opinion.

*D. The Memorandum Opinion*

In the Memorandum Opinion, the Bankruptcy Court found that the Motion to

Compel lacked merit because Air Safety had been administratively dissolved, and thus there was no debtor to return the surplus to under § 726(a)(6). In the Bankruptcy Court's own words, "there is no issue as to whether Air Safety continues to exist in good standing—it does not."

The Bankruptcy Court next considered the Motion to Distribute, carefully evaluating the Appellant's argument that the Stipulation was unenforceable because the Trustee did not honor her promise to "make distributions on a timely basis." Ultimately, the Bankruptcy Court concluded that the Trustee acted reasonably, filing the Motion to Distribute when the condition to doing so disappeared, to wit, resolution of McSweeney's claim. The Bankruptcy Court dismissed Appellant's argument that the Stipulation failed for lack of consideration due to the Trustee's failure to make timely interim distributions because the Stipulation expressly contemplated a delay for the claims resolution process and precluded reliance upon promises not contained therein.[6] Finally, the Bankruptcy Court found that the Stipulation satisfied the Eleventh Circuit's standard for enforcing settlements.

---

**6.** Appellant devotes a significant portion of its brief to an alternative description of the settlement as comprising *two separate agreements,* a "Claims Stipulation" and an "Equity Stipulation." According to Appellant, the Claims Stipulation represented that portion of the settlement that allowed distributions for claims filed by Camber, MSR, ABM, MAG, and King. Appellant continues that a separate "Equity Stipulation" was intended to cover the remaining claims, those represented in the Stipulation by the percentage-based distributions to the Madsens, Camber, King, and Coykendall. Appellant contends that it only consented to the Equity Stipulation because the Trustee agreed to make interim distributions within 30–60 days. Appellant's position is untenable. First, the only settlement agreement signed by all parties was the Stipulation; to the extent that the parties circulated an additional settlement agreement, it is un-

disputed that the Trustee never signed it. Second, the Stipulation explicitly integrates both elements of the distribution scheme, the claims and equity components, into a single document. Third, the record is devoid of support for Appellant's 30–60 day inducement, and the Stipulation expressly eliminates from consideration any "oral or written," "prior or contemporaneous promises, representations, agreements, warranties." Stipulation, p. 4, ¶ 12. Fourth, with respect to the Bankruptcy Court's finding that the Trustee never made such a promise, Appellant conceded at oral argument before me that "it would be difficult for this Court to find that the bankruptcy judge abused its discretion in making that finding...." Indeed, I agree with Appellant that the record belies any such promise, and therefore I will not address the legal authority associated with this argument.

On appeal, Appellant challenges the Bankruptcy Court's Memorandum Opinion on a number of grounds. After considering the briefs, the parties arguments, applicable statutes and case-law, I reverse the Memorandum Opinion's finding of Air Safety's non-existence, but affirm its ruling approving the Stipulation.

## II. Standard of Review

Bankruptcy Rule 9019(a) confers on the bankruptcy court the authority to approve a compromise or settlement. To fulfill this duty, a bankruptcy court must determine whether the proposed settlement is fair and equitable. *In re Gallagher*, 283 B.R. 342, 346 (Bankr.M.D.Fla. 2002) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)). The Eleventh Circuit's decision in *In re Justice Oaks II, Ltd.* sets forth a four-part standard for bankruptcy courts to use before approving a settlement. 898 F.2d at 1549. Those factors are: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

District courts sit as appellate courts over bankruptcy decisions. *Miner v. Bay Bank & Trust Co.*, 185 B.R. 362, 365 (N.D.Fla.1995), aff'd, 83 F.3d 436 (11th Cir.1996) (Table). A district court reviews a bankruptcy court's legal conclusions de novo. *In re Englander*, 95 F.3d 1028, 1030 (11th Cir.1996). By contrast, a district court must accept a bankruptcy court's factual findings unless they are clearly erroneous, and it must also "give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses." *Id.*

"The 'clearly erroneous' standard means that the reviewing court must be left 'with the definite and firm conviction that a mistake has been made.'" *In re Scrap Metal Buyers of Tampa, Inc.*, 253 B.R. 103, 107 (M.D.Fla.2000) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 375, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

A bankruptcy court's decision to approve a settlement is within its sound discretion, and will not be disturbed on appeal absent proven abuse of that discretion. *In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr.S.D.Fla.1988); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602–03 (5th Cir.1980). "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *In re Red Carpet Corp. of Panama City Beach*, 902 F.2d 883, 890 (11th Cir.1990). Bankruptcy court decisions on enforcing settlement agreements are accorded deference because bankruptcy courts are often in the best position to determine whether a settlement is fair and equitable. *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y.1993). In reviewing a bankruptcy court decision, the district court should bear in mind that the bankruptcy court had only to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *In re Southeast Banking Corp.*, 314 B.R. 250, 272 (Bankr.S.D.Fla.2004) (citations omitted).

After applying the appropriate standards to the legal and factual determinations rendered by the Bankruptcy Court, I find that its Memorandum Opinion should be reversed in part and affirmed in part.

## III. Analysis

## A. Air Safety's Existence [7]

Under the Bankruptcy Code's priority scheme, property of the estate shall be distributed, after all other priority claims have been paid, **to the debtor.** 11 U.S.C. § 726(a)(6). Appellant claims that Air Safety was entitled to the surplus left in the bankruptcy estate pursuant to § 726(a)(6), and that the Bankruptcy Court erred in declining to award the surplus to Air Safety because it was not in existence.

■■■ The Bankruptcy Court's ruling on this matter followed an application of the facts, including that Air Safety was inactive during the bankruptcy proceedings and that its corporate charter had lapsed, to the plain language of the applicable statute. Finding Air Safety was non-existent, the Bankruptcy Court ruled that 11 U.S.C. § 726(a)(6) was inapplicable.[8] I reverse the Memorandum Opinion on this point because I find that Florida law supports Air Safety's ability to take a surplus despite its status as administratively dissolved.

■■■ The issue of a company's existence is inseparable from state law according to the Supreme Court's decision in *Chicago Title & Trust Co. v. Forty–One Thirty–Six Wilcox Bldg. Corp.,* 302 U.S. 120, 127, 58 S.Ct. 125, 128, 82 L.Ed. 147 (1937) (existence of a corporation, and the terms of its existence, depend on state law); *see also In re Aurora Invs., Inc.,* 134 B.R. 982, 984 (Bankr.M.D.Fla.1991). I must, therefore, consider the Florida Statutes on administrative dissolution, and evaluate what effect, if any, an administrative dissolution has on a limited liability company's ability to take a surplus distribution in an otherwise fully-liquidated bankruptcy case.

Air Safety is a limited liability company governed by Chapter 608 of the Florida Statutes. Section 608.4481 specifies that "[a] limited liability company administratively *dissolved continues its existence but may not carry on any business except that necessary to wind up and liquidate its business* and affairs under s. 608.4431 and notify claimants under s. 608.4421." (Emphasis added). Section 608.4431(1) delineates activities that comprise winding up and liquidating, including: (a) collecting assets; (b) disposing of properties that will not be distributed in kind to company members; (c) discharging or making provision for discharging liabilities; (d) distributing assets in accordance with s. 608.444; and (e) doing every other act necessary to wind up and liquidate the business and affairs. Such activities do

---

**7.** Initially, I note that there is a dearth of case-law on the specific issue of whether an administratively-dissolved company exists for purposes of receiving a Chapter 7 surplus. Reasoning by analogy, Appellees cite the case of *Liberty Trust Co. Employees Profit Sharing Trust v. Holt (In re Liberty Trust Co.),* which holds, in an entirely unrelated context, that a dissolved corporation is "defunct" and has no further existence. 130 B.R. 467, 471 (W.D.Tex.1991). The issue before the *In re Liberty Trust* case was whether a Chapter 7 debtor exists apart from the bankruptcy estate such that it could pursue causes of action and assets abandoned by the Chapter 7 trustee. *Id.* at 470. In its analysis, the court actually *relied upon an assumption* about the status of dissolved corporations as "defunct" in reaching its own determination as to corporate existence. *Id.* at 472. The court never broached any of the unique issues here, including whether an administratively dissolved, or even a defunct corporation, could take surplus proceeds from the bankruptcy estate. I find the *In re Liberty Trust* case to be largely irrelevant to this case.

**8.** I will review this initial legal finding of the Bankruptcy Court *de novo. In re Whatley,* 874 F.2d 997, 1000 n. 5 (5th Cir.1989) (a determination about a corporation's existence is reviewed *de novo* ).

not include transferring title to the company's assets, preventing commencement of a proceeding by or against the company, abating or suspending proceedings pending by or against the company on the effective date of dissolution, or terminating the authority of the company's registered agent. Fla. Stat. § 608.4431(2).

Appellant demands that the Debtor receive any surplus left in the estate. The relevant statutes provide that an administratively dissolved corporation exists for a limited purpose, that is, to wind up its affairs. Florida law accords very little significance to the fact that a company is administratively dissolved. An administratively dissolved limited liability company may reinstate itself merely by filing relevant information with the Department of State. Fla. Stat. § 608.4482. In fact, reasoning under Florida law, the Eleventh Circuit held that an order against an administratively dissolved company awarding disgorgement, civil penalties, and injunctive relief is not futile because reinstatement is easy to accomplish. *SEC v. Diversified Corporate Consulting Group*, 378 F.3d 1219, 1228 (11th Cir.2004); *see also Allied Roofing Indus., Inc. v. Venegas*, 862 So.2d 6, 10 (Fla. 3d DCA 2003) (favoring resolution of cases on their merits, and therefore reversing trial court's decision to dismiss a complaint based upon the fact that the corporation was administratively dissolved while the lawsuit was pending).

Thus, it makes no sense to say that the Debtor cannot receive surplus funds because it was administratively dissolved; clearly, an administratively dissolved company in Florida is not "dead" for all purposes. The activity of receiving surplus funds fits within the category of "collecting assets" if it somehow contributed to wind-

ing up and/or liquidating the Debtor's affairs.

The record provides a divided account of whether the Debtor was winding down. On the one hand, when questioned what the Debtor would do with the surplus, Madsen, as agent for the Debtor's principal owner, remarked that he would gather the other owners and "get it figured out and get it over with." This suggests that the Debtor had only to breathe its last breath before final extinction. On the other hand, it is possible that Appellant could resurrect Air Safety by reinstating the company with the Department of State, and use whatever assets are returned to it to get the business back on its feet.[9]

I find that an award of the surplus to the Debtor can constitute "collecting assets," a legitimate function of an administratively dissolved limited liability company. I do not decide whether the Debtor existed for all purposes or not; I merely find that the contours of Air Safety's existence were definite enough to render it *capable* of receiving surplus proceeds. As such, the Bankruptcy Court erred in finding that Air Safety did not exist for purposes of receiving a surplus from the estate, and I reverse that portion of the Bankruptcy Court's decision.

### B. The Stipulation Is An Enforceable Subordination Agreement

Appellant claims that its case, "in a nutshell," depends upon this Court's interpretation of 11 U.S.C. § 726(a)(6), which requires a bankruptcy court to pay any excess funds in a liquidated estate to the debtor. Appellant pursues reversal of the Memorandum Opinion because it

---

9. This latter point raises less concern for me because the threat of resurrection exists with nearly every administrative dissolution in

light of Florida's relatively easy process for reinstatement.

awards the surplus in the estate to one other than the Debtor.

■ Had the Bankruptcy Court considered the Motion to Compel in a vacuum, then Appellant's "nutshell" characterization of the proceedings would prevail. However, I affirm the Memorandum Opinion because distribution to the Debtor in this case was not required given the Debtor's participation in the alternative distribution scheme posed by the Stipulation.

Thus, even though the Bankruptcy Court **could** have disbursed the surplus to the debtor if the Stipulation never existed (because the Debtor was in existence for purposes of receiving a surplus), its decision not to was appropriate given the terms of the Stipulation.[10] Indeed, because the Stipulation is a subordination agreement, I must affirm the Bankruptcy Court's decision to award the surplus proceeds pursuant to the Stipulation.[11]

10. Even though I reverse the Memorandum Opinion's finding that the Debtor did not exist for purposes of receiving a surplus, that does not mean that the remainder of the Memorandum Opinion should be reversed. Indeed, a reviewing court may affirm the court below on any ground supported by the record. *Farley, Inc. v. Chiappetta*, 163 B.R. 999, 1007 n. 19 (N.D.Ill.1994); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 n. 9 (11th Cir.1998); *Hempel v. U.S.*, 14 F.3d 572, 576 (11th Cir.1994).

11. Appellant's case is unique because of the existence of the Stipulation, and this fact renders the cases cited by the litigants inapplicable. Appellant cites *Holders of Class C Common Stock of Rimsat, Ltd. v. Kauthar (In re Rimsat, Ltd.)* to further his claim that the Bankruptcy Court erred in not delivering the surplus to Air Safety. 229 B.R. 910 (Bankr. N.D.Ind.1998). In *Rimsat,* the plaintiff was the official equity security holders' committee for the holders of the debtor's Class C common stock, and the defendant held all of the shares of the Class D stock, which had a liquidation preference over the Class C stock. *Id.* at 911. The plaintiff sought to equitably subordinate the defendant's interest to the equity interests of the Class C shareholders. *Id.*

The court acknowledged that in the rare situation that a surplus exists, circumstances might warrant that the surplusage pass to "one other than the bankrupt." *Id.* at 913 (citing *Time Oil Co. v. Wolverton (In re Wolverton)*, 491 F.2d 361, 365 (9th Cir.1974)). One such circumstance arises when the debtor is no longer in existence; in those cases, the surplus might pass through to the debtor's shareholders. *Id.* (citing *The Georgian Villa, Inc. v. U.S. (In re Georgian Villa, Inc.)*, 55 F.3d 1561, 1563 (11th Cir.1995); *Hendrie v.*

*Lowmaster,* 152 F.2d 83, 85 (6th Cir.1945)). But in *Rimsat,* the plaintiff wanted to not only bypass the debtor to arrive at its interest as a shareholder, but also to subordinate the interest of a higher-prioritized shareholder to its interest. 229 B.R. at 914. This court was not willing to do. *Id.* Delivery to the debtor was the proper procedure under § 726(a)(6). *Id.; In re Wolverton,* 491 F.2d at 365 (noting that the general rule that "surplus monies held by the trustee pass and return to the bankrupt after payment of all properly filed claims and costs of administration" applies unless exceptional circumstances require an equitable transfer of assets to "one other than the bankrupt."). *Rimsat* is distinguishable from this case because it involves equitable, not contractual, subordination.

Both parties cite *Georgian Villa* in their respective appellate briefs. 55 F.3d at 1563. In that case, the sale of the not-for-profit's property generated sufficient funds to pay all estate costs and claims, resulting in a $300,000 surplus. *Id.* at 1561–62. The debtor remained dormant during the proceedings, only to reactivate itself after the bankruptcy case closed in order to seek return of the surplus. *Id.* at 1562. The bankruptcy court denied the debtor's motion for return of surplus funds on grounds that, although it had remained in good standing with the Georgia Secretary of State, it was not a viable corporation because of its dormancy during the bankruptcy proceedings. *Id.* Since the company was not-for-profit, there were no shareholders to whom the court could distribute the surplus. *Id.* Therefore, the bankruptcy court ordered the surplus deposited in the United States treasury so as to avoid a windfall to the parties controlling the debtor. *Id.* The district court affirmed the bankruptcy court's denial of the debtor's motion for return of surplus funds. *Id.*

Bankruptcy Code Section 726 prioritizes claims. It reads as follows:

(a) ***Except as provided in section 510 of this title***, property of the estate shall be distributed—

(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title or tardily filed on or before the earlier of—

"(A) the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or

"(B) the date on which the trustee commences final distribution under this section;

(2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is—

(A) timely filed under section 501(a) of this title;

(B) timely filed under section 501(b) or 501(c) of this title; or

(c) tardily filed under section 501(a) of this title, if—

(I) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

(ii) proof of such claim is filed in time to permit payment of such claim;

(3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(c) of this subsection;

(4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;

(5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

(6) sixth, to the debtor.

(Emphasis added).

 Under the Code's distribution scheme, a debtor only becomes entitled to a distribution when all other claims are paid in full. *Perry v. First Citizens Fed. Credit Union*, 304 B.R. 14, 22 (D.Mass.

---

The Eleventh Circuit reversed, finding the debtor to be in existence, and therefore entitled to the funds pursuant to the plain language of the Bankruptcy Code. *Id.* at 1563. The court recognized the power given bankruptcy judges to exercise equitable authority 'within the confines of the Bankruptcy Code.' *Id.* at 1563 (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 969, (1988)). It stated:

Where the corporate debtor is no longer in existence, bankruptcy courts have similarly employed their equitable power to distribute the unclaimed funds to the shareholders. Where the corporate debtor is still in existence, however, there is no cause to look past the corporate entity to the individ-

ual shareholders, and the corporate entity is clearly entitled to the surplus funds.

*Georgian Villa*, 55 F.3d at 1563. (Citations omitted).

*Rimsat* and *Georgian Villa* seem to suggest that surplus proceeds should always be returned to the debtor so long as the debtor exists. Neither of these cases, however, address the unique situation at issue here involving a debtor who ***participates*** in a subordination agreement that alters its entitlement to a surplus distribution. The Bankruptcy Code specifically allows re-prioritization where the parties enter into an enforceable subordination agreement. This distinction renders *Rimsat* and *Georgian Villa* inapplicable.

2004) ("[i]n a Chapter 7 case, the *balance* of any unclaimed funds is paid to the debtor."), aff'd, 391 F.3d 282 (1st Cir. 2004) (emphasis added).[12] The Code's priority scheme favors resolution of all claims before payment of a surplus to the Debtor. "The distribution scheme under section 726 is the contemplated last step in the overall liquidation process of a Chapter 7 case." *In re El Paso Refinery, L.P.*, 244 B.R. 613, 619 (Bankr.W.D.Tex. 2000). Before this process can even begin, all property must be reduced to cash and all secured claims satisfied. *Id.* Each consecutive priority tier is paid in full before moving on to the next tier of claims. *Id.* In fact, even post-petition interest is payable to creditors *before* any remaining funds are returned to the debtor. *Id.* This particular strategy "is designed to prevent debtors from receiving an unfair *windfall*, at the expense of their creditors." *Id.* at 621 (emphasis added). Distribution of surplus funds is a distribution of last resort. In other words, everyone else with a claim against the estate is to be satisfied before any proceeds are returned to the debtor, and it is appropriate to take steps to avoid bestowing a windfall on the very entity that created the belabored recovery process in the first place.[13]

■■■ Despite the strict prioritization of claims in § 726, that section opens with an exception for subordinations under § 510. Section 510 addresses both contractual and equitable subordination. 11 U.S.C. § 510. Its effect on § 726 allows flexibility in payouts among senior and junior creditors when those parties agree to an alternate payment scheme, or when there are equitable reasons to prioritize one claim over another. Putting these concepts together, a bankruptcy court should follow the priority scheme established by § 726 *unless* there is a valid ground for subordination under § 510.

Appellee Camber argued that the Stipulation is a consensual subordination agreement pursuant to § 510(a) that effectively dissolves the priority scheme set forth in § 726. Section 510(a) itself is silent about what a subordination agreement is; it merely cautions that any such agreement "is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).

■■■ Case-law defines a subordination agreement as one in which "a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior." *In re Envtl. Aspecs, Inc.*, 235 B.R. 378, 396 (E.D.N.C.1999) (quoting *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr.S.D.Ohio 1990)). It is the means by which "one

---

**12.** Indeed, a debtor has standing to challenge a bankruptcy court's decision in a Chapter 7 case only when the estate will be left with a surplus for his enjoyment. *In re Nangle*, 288 B.R. 213, 216 (8th Cir. BAP 2003) ("[i]f the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order."), aff'd per curiam, 83 Fed.Appx. 141 (8th Cir.2003).

**13.** This does not mean that the Trustee has no obligation to consider the Debtor's potential residual interest. Rather, in a solvent Chapter 7 case, the trustee owes the Debtor a fiduciary duty in entering into settlements. *In re Spielfogel*, 211 B.R. 133, 145 (Bankr. E.D.N.Y.1997); *In re Central Ice Cream Co.*, 836 F.2d 1068 (7th Cir.1987). Here, the record demonstrates that the Trustee dutifully performed his fiduciary obligations to the Debtor by including it and its representatives in the settlement process and resulting Stipulation. The Stipulation effectively resolves all remaining claims with due regard for the Debtor's interest in a surplus.

creditor agrees to subordinate its claim against a debtor in favor of the claim of another." *In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr.S.D.N.Y.1994), *dismissing appeal*, 177 B.R. 791 (S.D.N.Y.1995), aff'd 68 F.3d 26 (2d Cir.1995).

■ It is generally held that § 510(a)'s reference to "non-bankruptcy law" refers to the law of contracts. *Id.* (citing *In re Gen. Homes Corp.*, 134 B.R. 853, 864 (Bankr.S.D.Tex.1991); *In re Sepco, Inc.*, 36 B.R. 279 (Bankr.D.S.D.1984)). Ordinary contract principles apply to the interpretation of a subordination agreement. *In re Gen. Homes Corp.*, 134 B.R. at 864.

■ As explained above, Appellant cannot complain about proceeds paid to higher priority interest-holders, including claims by Camber, King, and the Madsens' general claims and administrative expenses, because the debtor in a Chapter 7 estate receives funds, if at all, after everyone else has been paid. Therefore, Appellant must take exception to the Bankruptcy Court's allowance of distributions to those without an established interest in the estate, such as Coykendall, who asserted an administrative expense claim for his efforts in the Lockheed Martin Settlement. By insisting on a return of the proceeds to the Debtor and by contesting such quasi-claimants' rights to the surplus, Appellant implicitly argues that the Debtor has a higher interest in those funds.[14] Indeed, the Stipulation partially compromises the Debtor's absolute right to a return of the surplus in favor of the lesser interest-holders, the quasi-claimants who were not necessarily entitled to a distribution under § 726; thus it is a subordination agreement under bankruptcy law.[15]

■ The Stipulation is a valid subordination agreement so long as it enforceable under nonbankruptcy law. Florida law favors enforcement of settlement agreements whenever possible. *Robbie v. City of Miami*, 469 So.2d 1384, 1385 (Fla. 1985); *Sun Microsystems of California, Inc. v. Engineering & Mfg. Sys.*, 682 So.2d 219, 220 (Fla. 3d DCA 1996); *In re Munford, Inc.*, 97 F.3d 449, 455 (11th Cir.1996). In *Gulfstream Bank v. McCracken (In re Cormarc, Inc.)*, the court subordinated the landlords' lien to a bank's lower priority lien based on a contractual agreement between the parties. 29 B.R. 569, 571 (Bankr.S.D.Fla.1983) ("landlords' claim is subordinate to Plaintiff's lien by virtue of the contractual agreement between those parties."). In that case, the landlords induced the bank to lend the debtor additional money by voluntarily subordinating their higher priority lien to the bank's lien.

14. In its reply, Appellant states that:

It is not the Chapter 7 Trustee's job or the Bankruptcy Court's province to apportion and distribute surplus assets of the debtor. If that were the case, Section 726(a)(6) would have set forth additional guidelines for the rare cases where a Chapter 7 produces a surplus. Case law addressing the subject of surplus distribution to a corporate entity have clearly recognized that after payment of the different kinds of claims listed in the first five paragraphs of § 726(a), anything that remains goes 'to the debtor.' 11 U.S.C. § 726(a)(6).

15. Because it approved the Stipulation, the Bankruptcy Court never ruled upon the claims asserted by Camber, MSR, ABM, MAG, and King. It is possible that one or more of those claims might have been paid out ahead of the Debtor. Accordingly, I use the phrase "quasi-claimants" as a way of describing these creditors who may or may not have had legitimate claims against the estate. Appellant must assume that these claims were not legitimate so that it can argue for a return of the surplus to the Debtor (otherwise the quasi-claimants would have been paid ahead of the Debtor). This assumed lower level of priority, and the Debtor's compromise of its higher right, is what makes the Stipulation a subordination agreement by nature.

*Id.* According to the court, "[s]ection 510(a) makes that agreement strictly enforceable, rendering the landlords' claim subordinate to Plaintiff's lien. The Court finds no justification for changing the order of priority of claims, which the parties themselves have established by contract." *Id.* (citing *Citibank, N.A. v. Smith Jones, Inc.* 17 B.R. 128 (Bankr.D.Minn.1982)).

Likewise, Appellant gave the Bankruptcy Court no reason to disregard the terms of the Stipulation, which partially subordinated the Debtor's right to all of the surplus proceeds to other interested parties. Appellant's lone challenge to the enforceability of the Stipulation on contract principles involves his ill-fated claim for lack of consideration. As explained in footnote 6, *supra*, Appellant's argument that the Trustee promised to make interim distributions within 30–60 days is baseless. The Stipulation is enforceable under Florida law, and is therefore enforceable as an exception to the priority rules set forth in § 726.

▬▬▬ Appellant separately challenges the Bankruptcy Court's decision to approve the Stipulation. It is true that bankruptcy courts are not allowed to "rubber stamp" the trustee's recommendation for settlement. *In re West Pointe Props., L.P.,* 249 B.R. 273, 281 (Bankr.E.D.Tenn. 2000). Bankruptcy courts have an affirmative duty to independently evaluate whether the compromise is fair and equitable, although they are entitled to give the trustee's judgment some deference. *Id.* (citing *Johnson v. Jackson Family Television, Inc. (In re Media Cent., Inc.),* 190 B.R. 316, 321 (E.D.Tenn.1994)); *In re Edwards,* 228 B.R. 552, 569 (Bankr.E.D.Pa. 1998). In evaluating a proposed settlement, bankruptcy courts are expected to employ the four-factor *Justice Oaks* test. I find no abuse of discretion by the Bankruptcy Court in approving the Stipulation.

The Stipulation recognizes each Party's individual claim(s) against the estate, the fact that each Party disputed the others' claims, and the Parties' efforts to resolve the disputes, including the equity interests that a number of them asserted. The Parties reach the conclusion in the Stipulation that settlement of those various claims would be in the estate's best interests. Given the number of claims and potential objections, the Bankruptcy Court's conclusion that the Stipulation is the most efficient use of estate funds is not clearly erroneous.

The record supports that the Stipulation was clearly in the best interest of the creditors as prolonged litigation would only diminish the estate's assets. Likewise, the Debtor and its owners were best served through a quick and efficient resolution of claims because only then might there be sufficient excess funds in the estate to justify a surplus distribution to the Debtor. Put differently, had the Parties litigated each and every one of their claims and objections, there can be little question that, in the end, the administrative expenses associated with litigation would have eroded a good portion of the funds available for creditors, the Debtor, and ultimately those claiming equity interests in the Debtor.

Appellant contends that regardless of how the Stipulation fares under the four-factor *Justice Oaks* test, the Bankruptcy Court should not have approved it because it violates a number of provisions of the Bankruptcy Code. Initially, Appellant challenges the Stipulation's enforceability on grounds that it deprives the Debtor of its right to a surplus pursuant to 11 U.S.C. § 726(a)(6). I disagree with Appellant that the terms of the Stipulation violate the Bankruptcy Code. As already established above, the Stipulation is an enforceable subordination agreement.

Appellant also claims that the Stipulation and Memorandum Opinion violate other provisions of the Code. First, Appellant asserts that the Phase Two Distributions effected an improper shift in the membership interests of the Debtor because the percentage distributions therein do not correspond to the individual members' equity ownership percentages. However, this is a misreading of the intent of the Stipulation, which is clearly to settle all claims, including claims of various non-members to equity interests in the Debtor, through payments in pre-determined, agreeable amounts. The monies were to be distributed "based upon [certain] percentages." Stipulation, p. 3, ¶ 10. The Stipulation says nothing about determining the percentage interest that each member, or non-member, has in the Debtor; it merely compromises each owner and purported owner's claim in amounts that all Parties agreed were fair and reasonable.

■■■ Second, Appellant condemns the Stipulation and Memorandum Opinion for improperly awarding Coykendall a contingency fee that the Bankruptcy Court never approved pursuant to 11 U.S.C. § 328(a). That section reads that

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.

In his Motion For Payment Of Administrative Expense Or In The Alternative To Deem This Claim As A Timely Filed Unsecured Claim, Coykendall claims that he was hired not by the Trustee, but by an agent of Air Safety to assist with the Lockheed Martin litigation. Coykendall went on to state that he expected to receive payment from Air Safety's agent, not the Debtor; hence his late application for an administrative expense.

It is not at all clear to me that Coykendall performed professional services for the Trustee in a manner that required him to obtain leave of court before receiving payment pursuant to 11 U.S.C. § 327(a), or whether, instead, he was entitled to payment of his fee as an administrative expense. Indeed, Coykendall had a claim against the estate that was in dispute until the Stipulation was entered. In other words, compromise of Coykendall's claim by awarding him a percentage of the surplus funds *does not expressly violate* the terms of the Bankruptcy Code.[16] Moreover, the Memorandum Opinion's award of a percentage of surplus funds to Coykendall did not effectively give him an equity interest in the Debtor for the same reason that it did not alter the equity-holders' membership interests.

With all of this in mind, I conclude that the Memorandum Opinion properly approved the Stipulation. It was enforceable as a subordination agreement, and it adequately resolves all pending claims, including claims for equity interests in Air Safety. All of the Debtor's owners signed off

---

**16.** Although entry of an award of fees to Coykendall does not necessarily *violate* the terms of the Code because it requires an analysis of several defined terms, including whether Coykendall was a "professional person" under 11 U.S.C. § 327(a), the Bankruptcy Court, if given the chance, would probably have denied Coykendall's motion for payment

of his fee. *Stempler v. Larimore (In re Florida Airlines, Inc.)*, 110 B.R. 570, 573 (M.D.Fla. 1990) (affirming bankruptcy court's denial of the debtor's president's request for compensation because his services had not been previously approved by the bankruptcy court pursuant to 11 U.S.C. § 327(a)).

on the Stipulation, eliminating any risk that an owner's interest went unprotected. As determined by the Bankruptcy Court in the McSweeney Order, Air Safety was comprised of four members: GMGRSST, Camber, King, and Madsen. The Stipulation awards percentage-based distributions to Camber, King, Coykendall, and the Madsens. Camber, King, the Madsens, and Coykendall signed the Stipulation, and the motion to approve the Phase One Distributions. Since Alan Madsen is GMGRSST's general partner, all Parties with alleged equity interests in Air Safety approved the Stipulation that the Bankruptcy Court ultimately adopted. Every Party with a stake in the outcome of the remaining funds also supported the motion to approve Phase One Distributions (which sought partial enforcement of the terms of the Stipulation). The low risk of prejudice also mitigates in favor of enforcing the settlement agreement.[17]

In sum, the Stipulation subordinates the Debtor's right to receive excess funds in the estate to the claims of certain purport-ed interest-holders not otherwise satisfied under the priority scheme. The Stipulation is an enforceable subordination agreement under both Florida and bankruptcy law. It was the most efficient use of estate resources, and for all of these reasons, I affirm the Memorandum Opinion.

### C. Judicial Estoppel

■■■■■ Appellees also contend that by joining in the Stipulation, jointly moving to approve the Phase One Distributions, and accepting benefits under the Phase One Distributions, Appellant is estopped from now asserting that the Stipulation is unenforceable. I conclude as a matter of law that the doctrine of judicial estoppel prevents Appellant from challenging the Stipulation, because it previously supported its terms to the Bankruptcy Court and contributed to the eventual Bankruptcy Court Order authorizing Phase One Distributions.[18]

■■■■■ The Eleventh Circuit has long respected the doctrine of judicial estoppel,

---

17. Indeed, Appellant does not claim that its interests were not fairly represented, or that it somehow did not understand the terms of settlement.

18. There is another reason why Appellant's duplicitous conduct with respect to the Stipulation requires that I affirm the Memorandum Opinion. According to Appellant's counsel at oral argument, the $901,000 payable to ABM and $199,000 payable to MAG eventually wound up in Appellant's coffers. Nevertheless, Appellant challenges the Stipulation as unenforceable. Florida law estops a party who receives benefits under a settlement agreement from attacking that agreement. *Sav–A–Stop Inc. v. Jaydon, Inc. (In re Sav–A–Stop Inc.)*, 124 B.R. 356, 360 (Bankr.M.D.Fla. 1991). Additionally, Appellant's double-dealing implicates rescission concerns not raised by the parties below. Florida law requires a party challenging a voidable contract to make an election of remedies between rescission and damages. *Jackson v. BellSouth Tele-*comms., 372 F.3d 1250, 1279 (11th Cir.2004). In order to challenge the Stipulation, one that incorporates a general release, Appellant needed to choose rescission over damages, and remit the benefits received under the Stipulation before proceeding any further. *Id.; Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 223 F.3d 1275, 1282–83 (11th Cir.2000) ("[a] prerequisite to rescission is placing the other party in status quo" by returning the benefits received under the contract to your opponent). "Florida law leaves no room for debate over when a party must disgorge the benefits of an agreement whose terms it seeks to avoid." *Id.* Like the plaintiff in *Jackson*, Appellant wishes to retain the monies received from the First Phase Distributions while at the same time challenging the disbursements contemplated by the Second Phase Distributions. *Id.* "Florida law does not provide [Appellant] with such a windfall." *Id.* However, because the parties failed to raise rescission below, this analysis does not contribute to my ruling.

which essentially blocks parties from taking "sworn divergent positions" in an effort to prevent them "from making a mockery of justice by inconsistent pleadings." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F.Supp.2d 1344, 1367 (S.D.Fla. 2005). It exists to prevent litigants from "playing fast and loose with the courts." *Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir.2003) (citing *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir.1996)).

It used to be that for judicial estoppel to apply, the movant needed to demonstrate that his opponent made the prior inconsistent statement under oath. *Id.* However, the United States Supreme Court essentially relaxed this standard in its opinion in *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). In *New Hampshire*, the state of New Hampshire sued the state of Maine to resolve a boundary dispute between them. *Id.* at 745, 121 S.Ct. 1808. Central to the dispute was the definition of the term "Middle of the River," which existed in a 1740 boundary decree issued by King George II. *Id.* at 746, 121 S.Ct. 1808. Maine asserted the defense of judicial estoppel. *Id.* at 748, 121 S.Ct. 1808. Its theory was that the parties had previously agreed to a definition of "Middle of the River" during litigation pending in the 1970's that ultimately culminated in the award of a consent decree by the presiding Court at the time. *Id.* at 748, 121 S.Ct. 1808.

■■■ According to the Supreme Court, judicial estoppel is a doctrine intended to protect the integrity of the judicial system. *Id.* at 749, 121 S.Ct. 1808. It accomplishes this end by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 750, 121 S.Ct. 1808 (citing *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993)). And

because of its role as guardian of the judicial process, it may be invoked at a court's discretion. *Id.*

The central issue before the Supreme Court was *when* a court may exercise its discretion to call upon the doctrine of judicial estoppel. The Court recognized that appropriate circumstances are not "reducible to any general formulation of principle," but went on to suggest a number of factors that assist in the decision regarding whether to apply the doctrine in a particular case. *Id.*

First, the latter statement must be clearly inconsistent with the former one. *Id.* Second, there should be some indication that either the first or second court was misled. *Id.* Third, it helps to consider whether the party taking an inconsistent position would unfairly benefit, or whether its position would cause its opponent an unfair detriment. *Id.* at 751, 121 S.Ct. 1808. After reciting these guideposts, the Court noted that "we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." *Id.*

Applying the three factors to the case before it, the Court found it appropriate to employ judicial estoppel and dismiss New Hampshire's complaint because it ignored the state's earlier, inconsistent position in the 1970's litigation. To begin, Maine demonstrated that the two positions were clearly inconsistent. *Id.* Maine also succeeded in proving that the prior Court accepted the parties' definition of "Middle of the River", despite New Hampshire's protests that the definition arose from a settlement and was not the definition that New Hampshire favored. *Id.* at 752, 121 S.Ct. 1808. *See also Hall*, 327 F.3d at 399 (judicial acceptance may be invoked whenever a party intends to induce the court's

reliance). The Court found it relevant that New Hampshire characterized the proposed consent judgment as in its best interests, and it would not entertain New Hampshire's attempts to distinguish the prior litigation from the present one. *Id.* The Supreme Court stated that, "[w]e cannot interpret 'Middle of the River' to mean two different things along the same boundary line without undermining the integrity of the judicial process." *Id.* at 755, 121 S.Ct. 1808.

I conclude that the integrity of these proceedings, and those before the Bankruptcy Court, would be undermined if judicial estoppel were not applied in this case. First, Appellant's position that the Stipulation is unenforceable is clearly inconsistent with its position in both the Stipulation itself and the Joint Motion. In the Stipulation, Appellant expressly acknowledges the two phases of distributions to claim and equity interest-holders. In paragraphs 8 and 9 of the Stipulation, the Parties agree to support a Bankruptcy Court order that authorizes the Phase One Distributions to Camber, MSR, ABM, MAG, and King in exchange for mutual releases between the Parties. Appellant further promises, in paragraph 10, to "support and agree" to a Bankruptcy Court order authorizing the Phase Two Distributions.[19] The Parties, including Appellant, promise to support the Trustee's efforts to resolve claims and assist her in closing the cases, but recognize that the agreement is "contingent upon the Trustee's objection to the equity claim of Patrick McSweeney being sustained whereby the Court would find that Patrick McSweeney does not hold any equity interest within the Debtors." *Id.*, p. 4, ¶ 11. At no point prior to the

Motion to Compel did Appellant challenge the Stipulation as unenforceable or void.

Appellant's faith in the Stipulation's enforceability extends further. In May, 2004, Appellant joined the other Parties in signing the Joint Motion regarding Phase One Distributions and supporting the Joint Motion before the Bankruptcy Court. Like the Stipulation, the Joint Motion reflects the Parties' understanding that they cannot pursue distributions to equity holders until the Bankruptcy Court reaches a final determination on McSweeney's equity claim. Appellant raised no objection to this divided approach to winding up the bankruptcy estate's affairs.

The Bankruptcy Court entered an Order authorizing the Phase One Distributions in August, 2004. Just over two months later, Appellant took the ***entirely opposite position***, resisting enforcement of the remainder of the Stipulation on grounds that it violates the Bankruptcy Code. One minute Appellant seeks to enforce the Stipulation; the next it demands that the Bankruptcy Court reject the Stipulation outright. Its positions are clearly inconsistent with one another.

Second, Appellant, together with the other Parties, successfully convinced the Bankruptcy Court of the Stipulation's viability because the Bankruptcy Court ultimately authorized the Phase One Distributions. In *Reynolds v. Comm'r of Internal Revenue*, the Sixth Circuit held that judicial estoppel is appropriate when a bankruptcy court relies on a party's position in approving a settlement authorizing payments from a bankruptcy estate. 861 F.2d 469, 473–74 (6th Cir.1988) ("[a] statement

---

**19.** The Stipulation contains a number of other standard contract clauses, including that the Parties acknowledged their joint efforts towards the drafting process, that each finds the terms of the Stipulation to be "fair, just,

equitable, reasonable, fully acceptable, and not unconscionable," and that the settlement is "in the best interests of the Parties and the Estates." *Id.*, pp. 2–3 & 5, ¶¶ 6, 14, & 16.

directly incorporated in a stipulation approved and signed by the court affords an even stronger basis for application of the judicial estoppel doctrine."). Like in *Reynolds*, Appellant represented to the Bankruptcy Court that the Stipulation was viable and then later challenged that same Stipulation as void. Its current position means that the Bankruptcy Court was misled when it approved the Joint Motion in May, 2004, or that this Court is being misled now. This is just the sort of gamesmanship that the doctrine of judicial estoppel works to prevent. *Allapattah*, 372 F.Supp.2d at 1370 (defendant "makes a mockery of justice by its inconsistent pleadings.").

Third, were this Court to condone Appellant's inconsistent positions, then Appellant would derive an unfair benefit to the detriment of his fellow settling Parties. Appellant demands that any remaining funds in the estate be returned to the Debtor because the Stipulation is unenforceable. If I were to accept Appellant's position, then I might have to consider unwinding the entire Stipulation, including awards of the Phase One Distributions to the various unsecured and administrative claim-holders. Not only would this undertaking require impossible logistics, it would also re-open a host of hotly contested disputes between the Parties, threatening litigation that could diminish any funds remaining in the estate to near extinction.

If it would be unnecessary to unwind the Phase One Distributions, then Appellant's position vis-a-vis other Parties stands to improve dramatically if I accept Appellant's argument. GMGRSST was already the ultimate beneficiary of over $1 million under the Phase One Distributions. If I were to accord Appellant the relief it requests, and order that surplus proceeds be returned to the Debtor, Appellant could pursue a distribution from the Debtor in the amount of 84%, the share of its equity in Air Safety. The scheme contemplated by the Stipulation and Memorandum Opinion awards nothing to Appellant, and only 53.48% of the first $2,280,000 (79.4155% of any monies beyond $2,280,000) to Appellant's general partner, Madsen, and his wife. Clearly, Appellant would recover more if I reversed the Memorandum Opinion and awarded the surplus to the Debtor.

Like in *New Hampshire*, Appellant cannot resist the bargain it struck through settlement. Judicial estoppel exists to prevent parties from conducting themselves the way that Appellant has done in the proceedings below. For this reason, I conclude that, regardless of the Stipulation's enforceability, Appellant is judicially estopped from making the argument because it previously touted the Stipulation's enforceability to the Bankruptcy Court.

### D. Abstention

As a final point, Appellant suggests that the Bankruptcy Court should have abstained from deciding issues "relating to apportionment of the Debtor's equity surplus" in accordance with 28 U.S.C. § 1334(c)(1) & (2), the sections for mandatory and discretionary abstention. According to Appellant, the Bankruptcy Court should have allowed an interpleader action in state court to proceed on the issue of the Debtor's surplus funds.

To bolster its point, Appellant relies upon a strained interpretation of the Memorandum Opinion's award of Phase Two Distributions. That is, Appellant mischaracterizes the Bankruptcy Court's actions as improperly interfering with the equity membership interests in Air Safety. Instead, I conclude, as I did previously, that the Stipulation merely awards percentage distributions of surplus funds to Air Safety's members, as opposed to re-distributing equity *in those* members and thereby

changing their membership interests. It is an important distinction that Appellant fails to recognize.

 Nevertheless, even if the Memorandum Opinion had the effect projected by Appellant, no grounds exist for the Bankruptcy Court to have abstained on these issues. With respect to mandatory abstention, one of the key elements is that an action "must have been commenced and must be pending in a state forum." 28 U.S.C. § 1334(c)(2) ("[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding *if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction*."); *H.J. Rowe, Inc. v. Sea Prods. (In re Talon Holdings, Inc.)*, 221 B.R. 214, 220 (Bankr. N.D.Ill.1998); *Southwinds Assocs. Ltd. v. Reedy (In re Southwinds Assocs. Ltd.)*, 115 B.R. 857, 861 (Bankr.W.D.Pa.1990) (emphasis added). Since it is undisputed that there is no state court action pending on this issue, mandatory abstention is inapplicable. *Southwinds*, 115 B.R. at 861.

 As the term suggests, discretionary abstention is a power reserved to the Bankruptcy Court. In this case, discretionary abstention is equally unwarranted given the significant amount of time and effort invested by the Bankruptcy Court in this issue, and the fact that it is the last issue to resolve before closing the case. *In re Southwinds*, 115 B.R. at 861 (bankruptcy court refusing to abstain because "[a] substantial amount of time has been expended by the parties to this action in proceedings before this Court."). I con-

clude that the Bankruptcy Court's review of the issue in lieu of abstention was not an abuse of discretion. *In re Prudential Lines, Inc.*, 170 B.R. 222, 228–29 (S.D.N.Y. 1994) (bankruptcy court did not abuse discretion in declining to abstain on core proceeding).

## IV. Conclusion

This appeal concerns how a bankruptcy court may disburse surplus estate funds, and then what effect, if any, an agreement pre-determining disbursal has on the bankruptcy court's options in that regard. The Bankruptcy Court concluded that Air Safety was not in existence at the time of distributions because it was administratively dissolved; I reverse because Florida law on administrative dissolution suggests that Air Safety was "alive" enough to receive surplus funds.

Even though it was entitled to the surplus funds, the Debtor knowingly participated in a settlement stipulation that partially subordinated its rights to other alleged interest-holders, represented the enforceability of that settlement to the Bankruptcy Court, and obtained benefits under a portion of the settlement. Months later, the Debtor decried the settlement stipulation as unenforceable. I disagree that the Stipulation is unenforceable, and even if it were, I find Appellant's position forestalled by the doctrine of judicial estoppel.

Accordingly, I REVERSE the Memorandum Opinion in part, and AFFIRM it in part. The Trustee's Motion to Strike Appellant's Designations of the Record [DE 7] is denied as MOOT. This case is CLOSED.